*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| RODNEY S. PEDERSON, ) | |
| ) | Supreme Court No. S-15056 |
| Appellant, ) | |
| ) | Superior Court No. 3AN-09-10971 CI |
| v. ) | |
| ) | O P I N I O N |
| ARCTIC SLOPE REGIONAL ) | |
| CORPORATION, and MARY ) | No. 6939 – August 8, 2014 |
| ELLEN AHMAOGAK, in her ) | |
| capacity as Corporate Secretary, ) | |
| ) | |
| Appellees. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Sen K. Tan, Judge.

Appearances: Rodney S. Pederson, pro se, Anchorage, Appellant. Susan Orlansky and Jeffrey M. Feldman, Feldman Orlansky & Sanders, Anchorage, for Appellees.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.

## I. INTRODUCTION

A shareholder of Arctic Slope Regional Corporation sought to exercise his statutory right to inspect books and records of account and minutes of board and committee meetings relating to executive compensation and an alleged transfer of equity in corporate subsidiaries to executives. The Corporation claimed that the materials were

confidential and sought to negotiate a confidentiality agreement prior to release of any documents. When the shareholder ultimately rejected the proffered confidentiality agreement, the Corporation released to the shareholder only the annual reports and proxy statements of the Corporation and the minutes describing the subjects discussed and actions taken at the meetings. The shareholder did not receive the detailed, individualized compensation information he sought.

The shareholder brought suit, claiming that the Corporation withheld information that it was required to release under AS 10.06.430 and that the Corporation improperly insisted on a confidentiality agreement prior to releasing any of the requested documents. The superior court ruled that electronically maintained accounting records are not within the statutory category of "books and records of account"; that the Corporation satisfied the requirement to disclose "books and records of account" when it disclosed only annual reports and proxy statements; and that the Corporation satisfied the requirement to disclose meeting minutes. It further concluded that the Corporation could demand a confidentiality agreement prior to release of any information, and that the terms of the particular confidentiality agreement offered in this case were reasonable. The shareholder appeals, arguing that the statutory right of inspection encompasses more than what the Corporation provided and that the Corporation had no right to demand the confidentiality agreement in this case.

This appeal presents several issues of first impression in Alaska. We hold that (1) the statutory phrase "books and records of account" includes electronically maintained books and records of account; (2) the statutory phrase also goes beyond mere annual reports and proxy statements; and (3) the statutory phrase at least encompasses monthly financial statements, records of receipts, disbursements and payments, accounting ledgers, and other financial accounting documents, including records of individual executive compensation and transfers of corporate assets or interests to

executives. We further hold that (4) the statutory category "minutes" does not encompass all presentations or reports made to the board but rather merely requires a record of the items addressed and actions taken at the meeting, as have been faithfully recorded after the meeting. Finally, we hold that (5) a corporation may request a confidentiality agreement as a prerequisite to distributing otherwise-inspectable documents provided that the agreement reasonably defines the scope of confidential information subject to the agreement and contains confidentiality provisions that are not unreasonably restrictive in light of the shareholder's proper purpose and the corporation's legitimate confidentiality concerns. We conclude that the Corporation's proffered confidentiality agreement in this case was not sufficiently tailored or limited in scope and thus Pederson's refusal to sign it could not serve as a legal basis for avoiding liability for denying his inspection claims.

## II.  FACTS AND PROCEEDINGS

### A.  The Parties

Arctic Slope Regional Corporation is an Alaska Native Regional Corporation organized under the Alaska Native Claims Settlement Act[1] and AS 10.06.960 and incorporated under the Alaska Corporations Code, AS 10.06. At the time of trial, the Corporation took in about $2.5 billion in revenue each year, employed about 10,000 people, and had operations across the country and around the world. The Corporation had about 11,000 shareholders in 2012,[2] about 6,000 of whom were adults holding voting shares.

---

[1]  43 U.S.C. §§ 1601-29 (2006).

[2]  GOVERNMENT ACCOUNTABILITY OFFICE, REGIONAL ALASKA NATIVE CORPORATIONS: STATUS 40 YEARS AFTER ESTABLISHMENT, AND FUTURE CONSIDERATIONS 53 (2012), *available at* http://www.gao.gov/assets/660/650857.pdf.

Rodney Peterson is an original shareholder of the Corporation, holding 100 Class A shares. An attorney and a member of the Alaska bar, Pederson worked as assistant corporate counsel to the Corporation and later as an executive for one of the Corporation's subsidiaries. The employment relationship soured. Since then Pederson has unsuccessfully sought election to the Corporation's board and at the time of trial in this case had filed three lawsuits against the Corporation, as well as a counterclaim in a suit brought by the Corporation against Pederson.

**B.      Pederson's Request For Detailed, Individual Compensation Information For Executives And Board Members Contained Within "Books And Records Of Account" And "Minutes" Under AS 10.06.430's Shareholder Inspection Right**

On June 17, 2009, Pederson sent three letters to the Corporation seeking to exercise his shareholder inspection right under AS 10.06.430(b).[3] He sought "to inspect and copy the books, records of account and minutes of proceedings of the [Corporation's] Board of Directors and Committees of the [Corporation's] Board of

---

[3]      As relevant in this case, AS 10.06.430(a) requires Alaska corporations to "keep correct and complete books and records of account" as well as "minutes of proceedings of its shareholders, board, and committees of the board." AS 10.06.430(b) requires Alaska corporations to

> make its books and records of account, or certified copies of them, reasonably available for inspection and copying at the registered office or principal place of business in the state by a shareholder of the corporation. Shareholder inspection shall be upon written demand stating with reasonable particularity the purpose of the inspection. The inspection may be in person or by agent or attorney, at a reasonable time and for a proper purpose. Only books and records of account, minutes, and the record of shareholders directly connected to the stated purpose of the inspection may be inspected or copied.

Directors" that were "in any way related to, discussing, considering, making recommendations in regard to, funding, and approv[ing]" four different actions related to compensation of and transfer of Corporate interests to executives, board members, and Corporate officers.[4]

Pederson's demand letters stated that the purpose of his request for inspection was "[t]o obtain true and accurate information and records regarding" the four Corporate actions listed above. The letters went on to clarify that the information he obtained would be used only to persuade his fellow shareholders to adopt two specific changes to the Corporation's governing documents.[5]

---

[4] Specifically, Pederson sought information relating to (1) "the purchase of the 9.5% minority interest in the ASRC Federal Holdings, Inc. subsidiary of [the Corporation] referenced and discussed in the [Corporation's] Annual report package mailed in 2009"; (2) "the transfer of, conveying, selling and/or granting of stock or shares, or any other interest in the ASRC Federal Holdings, Inc. subsidiary of [the Corporation] to Officers or Executives of [the subsidiary] or any other subsidiary owned or majority owned by [the Corporation]"; (3) "[the] purchase of annuities and approval by the [Corporation's] Board of Directors of the Supplemental Executive Retirement Plan referenced in the [Corporation's] Annual Report package mailed in 2009"; and (4) "Officer and Executive compensation packages, including, but not limited to, base salaries, bonuses, incentive programs, performance incentives, deferred compensation, retirement plans or contributions other than for plans available to all employees, recommended for approval by [the Corporation's] Board Committees and approved by the [Corporation's] Board of Directors during the past five (5) most recent fiscal years."

[5] Specifically, Pederson sought: (1) "to prohibit the granting, transfer, or conveyance of stock, shares or other interest in [Corporate] subsidiaries to Officers, Executives, or Board members of subsidiaries (unless the officer or executive sold the company to [the Corporation]) without the prior approval of a majority of [the Corporation's] Shareholders or shares voting," and (2) "to prohibit current [Corporate] Board Members from also serving as, being elected, or being appointed as compensated Corporate Officers (other than normal Board member compensation or retainer) or Senior Executives of [the Corporation], unless they resign from the Board of Directors

(continued...)

**C.**     **The Corporation Demands A Confidentiality Agreement Prior To Release Of Any Documents; Pederson Negotiates But Then Rejects Any Confidentiality Agreement**.

Mary Ellen Ahmaogak, the Corporation's Corporate Secretary, replied to Pederson's initial demand letters on July 28, 2009, proposing to give Pederson the records he had requested "to the extent they consist of copies of the relevant portions of the minutes of [the Corporation's] board and committee meetings and copies of the relevant portions of [the Corporation's] regularly maintained accounting records." The Corporation notified Pederson of its view that "[t]he bulk of the records responsive to your request consist of annual reports and proxy statements for [the Corporation] and reports made to [the Corporation's] Compensation Committee by the Hay Group," an independent executive-compensation consultancy. The Corporation also asserted that "[t]he books and records you have requested contain trade secrets and confidential information" and insisted that prior to its release of the records, Pederson must "sign a confidentiality agreement regarding these books and records to ensure they will not be disclosed other than to people entitled to see them."

The Corporation's first proffered confidentiality agreement stated that "[a]ll"[6] of the information to be released was "Confidential Information" subject to the

---

[5](...continued)
of [the Corporation], prior to election, appointment or service as a compensated Corporate Officer or Senior Executive of [the Corporation]."

[6]     The Corporation's assistant in-house counsel at the time testified at trial that "we responded with the confidentiality agreement because of the fact that there were documents that he was requesting that were beyond what we thought we were legally required to produce," and that some of the excess was information the Corporation preferred to keep confidential. But the confidentiality agreement did not distinguish between confidential and non-confidential information or information required to be disclosed under the statute and information that would be disclosed gratuitously.

terms of the agreement despite being inspectable "pursuant to AS 10.06.430."[7]  The agreement would permit disclosure "to other shareholders" and their agents but would make Pederson liable to the Corporation for unauthorized disclosure by those third parties.

Pederson responded on August 6, 2009, suggesting specific additions and subtractions to the Corporation's first proffered confidentiality agreement.  But Pederson soon changed his mind and rejected the notion that he had to sign a confidentiality agreement as a prerequisite to obtaining the materials he had requested pursuant to AS 10.06.430.  He stated in a letter dated August 12, 2009, that nothing in the statute would require him to sign such an agreement, and he pledged in lieu of an agreement "to do [his] best to ensure that any information [he] prepare[d] for [his] fellow Shareholders based on any actual confidential information contained in the records [he] ha[d] requested [would] not [be] available to the public." He proposed to "prepar[e] the information in a manner that minimizes the disclosure of actual confidential information, while still allowing [Pederson] to provide enough information to Shareholders to make persuasive arguments for updating [the Corporation's] corporate governance documents."

After receiving Pederson's suggested edits to the confidentiality agreement, the Corporation sent him a responsive letter dated August 21, 2009, agreeing "to almost all of the modifications [Pederson] proposed." But the Corporation made one significant addition to the newest draft of the agreement:  After accepting Pederson's request to omit language subjecting him to personal liability for disclosures of confidential information by third parties with whom he would be permitted to share confidential information, the

_____

[7]     The agreement also attempted to include in the definition of Confidential Information information "gathered by the Shareholder, and all reports, studies, analyses and documents based thereupon which are prepared by the Shareholder."

Corporation inserted a new requirement that Pederson "obtain . . . a confidentiality agreement . . . that subjects [the person to whom Pederson seeks to disclose confidential information] to the same restrictions imposed on [Pederson] in this Agreement."

In a letter dated August 24, 2009, after receiving the Corporation's second proffered confidentiality agreement, Pederson rejected the new draft and reiterated his rejection of any confidentiality agreement. He stated his view that he was "already legally entitled" to the documents he requested, regardless of the existence of a confidentiality agreement. He further objected to the scope of the definition of "Confidential Information" in the draft agreement, to the potential liability to which it subjected him, and to the "extremely onerous requirement that [he] obtain signed agreements from every shareholder with whom [he] share[d] the information." He reiterated his offer to "take reasonable measures to limit access by the public to certain information that is actually confidential or a trade secret, but management must point out what that information is."

## D.    The Corporation Releases Some Information.

The Corporation's in-house and outside counsel attempted to determine the scope of the information that the Corporation had to release under AS 10.06.430. It appeared that the Corporation had never had any shareholder requests to inspect corporate books and records of account and minutes until Pederson's initial demand letters of June 17, 2009, and that the Corporation had no established procedure for responding to such requests. Similarly, no cases from this court defined the scope of "minutes" or "books and records of account." The Corporation eventually determined that "books and records of account" included only the Corporation's annual reports and proxy statements and that the Corporation possessed no other "books and records of account" within the meaning of the statute. It also concluded that "minutes," as used in the statute, included the concise descriptions of what happens in board meetings that are

prepared after the meetings but did not include presentations made to the board, handouts provided to the board, or other sensitive confidential or proprietary information that may have been omitted from the typed minutes for various reasons. The Corporation went on to identify other materials such as reports and presentations to the board that it concluded were not part of the minutes or books and records of account, and thus not covered by the statute, but were relevant for Pederson's stated purposes.

On August 27, 2009, three days after the date of Pederson's second letter rejecting any confidentiality agreement, the Corporation informed Pederson that it was delivering to him "all of the material that you requested that can be made available, in the absence of protections safeguarding confidentiality." Later, the Corporation explained that it redacted "specific salary and benefits information of individual employees." The Corporation's assistant corporate counsel testified at trial that he had reviewed all of the corporate minutes as well as the books and records of account, as he had defined these terms, compiled all information in those sources related to Pederson's stated interests, and transmitted all of those required documents — without redaction of relevant information — to Pederson's attorney. The assistant corporate counsel also testified that he identified a number of reports to the board that were relevant to Pederson's interest but not part of the "minutes" or "books and records of account" as he had defined those terms; he produced those reports for Pederson "[a]s an accommodation" after redacting information that the Corporation was not willing to share voluntarily without the sort of confidentiality agreement that Pederson had rejected.

E.    **Pre-Trial Proceedings**

Pederson brought suit against the Corporation and Mary Ellen Ahmaogak, in her capacity as Corporate Secretary (collectively, "the Corporation"). He claimed that he had submitted a written demand stating with particularity a proper purpose for

inspecting minutes and books and records of account, as required under AS 10.06.430(b), and that the Corporation had sought to impose unreasonable conditions on release of the information he sought and later improperly denied his request by releasing less than what was required under the statute. He sought a money judgment as permitted under AS 10.06.430(c), including punitive damages, and a court order as permitted under AS 10.06.430(d) compelling production of all minutes and books and records of account relevant to the proper purpose stated in his demand letters but not produced by the Corporation.

Pederson and the Corporation both moved for summary judgment. The Corporation stipulated "[f]or purposes of the summary judgment cross-motions" that it "does not dispute that, in his correspondence, Pederson stated legally proper purposes for his requests." Thus, in the view of the parties, the only issues remaining in the case were the legal issues of the scope of the inspection right under AS 10.06.430 and the Corporation's ability to demand a confidentiality agreement prior to its release of any information.

The superior court initially denied summary judgment to both parties because of three remaining factual disputes: (1) whether the omitted portions of the disclosed documents were truly unrelated to Pederson's requests; (2) whether additional responsive documents were never disclosed at all; and (3) whether the Corporation produced required documents within a "reasonable time."

The Corporation moved for reconsideration, arguing that the only factual disputes as to which documents had been disclosed and whether the redactions included inspectable information could be resolved through in camera review of the disclosed documents and the originals. Pederson did not oppose the Corporation's motion for reconsideration. He reasoned that the in camera review process would dispose of all remaining factual disputes and that the other remaining issues relating to the

confidentiality agreement were legal issues. And in Pederson's view, the factual questions would be relevant only if the superior court were to address the initial legal question whether a corporation can demand a confidentiality agreement prior to disclosing statutorily required information.

The superior court granted the motion for reconsideration, and the Corporation provided the superior court with copies of the documents provided to Pederson as well as unredacted copies of the original documents. In order to confirm the authenticity of the documents provided to the superior court, Pederson was permitted to compare the redacted documents provided to the court with the documents he already possessed. Due to the allegedly sensitive nature of their contents, the unredacted original documents were provided to the court ex parte; Pederson was not permitted to view them. After comparing the documents in his possession to the redacted copies to be submitted to the court, Pederson filed an affidavit stating that there were documents in the pile to be submitted to the court that he had not received in the Corporation's prior disclosure, including the 2008 Annual Report, a board resolution, and several pages of committee minutes corresponding to missing pages.

On February 4, 2011, the superior court ruled on reconsideration that the Corporation was entitled to partial summary judgment. The superior court concluded that the statutory requirement that a corporation allow inspection of "books and records of account" was satisfied in this case by the release of annual reports and proxy statements, which "contain independent accounting audits of [the Corporation], including overall and averaged information about executive compensation" but not "detailed accounts of compensation for individual executives." Similarly, the superior court implicitly ruled that the Corporation satisfied the statutory requirement to allow inspection of "minutes" by providing the typed post-meeting notes and by withholding more-detailed reports presented at the meetings.

Pederson moved for reconsideration of the partial grant of summary judgment. He argued that the superior court had overlooked a regulation applicable to Alaska Native Regional Corporations which states that the corporations' proxy solicitations must include "a statement of all current remuneration distributed or accrued and of all future remuneration contributed during the corporation's last fiscal year on behalf of . . . each of the five most highly compensated directors or officers for his services in all capacities to the corporation and its subsidiaries, naming each such person."[8] Pederson maintained that regardless of the superior court's holding in the partial grant of summary judgment, the statutory inspection right extends to classes of documents beyond what the Corporation gave him in this case. The superior court denied Pederson's motion for reconsideration, stating that it would deal with this issue at trial since full summary judgment had been denied.

### F. Trial Proceedings

On September 18, 2012, the superior court held a one-day bench trial. Although the pre-trial orders purported to resolve many questions of fact and law, the superior court ultimately allowed[9] Pederson to argue de novo that "books and records of account," as used in the statute, "should clearly include the detail, the electronic records of accounts, monthly financial statements, budget documents, ledgers, and even check registers that form the basis of the financial records of the corporation." He also

---

[8]     3 Alaska Administrative Code (AAC) 08.345(b)(2)(A) (2014).

[9]     The superior court said, "I'm going to make this easy. I'm going to let Mr. Pederson put on his case." During closing argument at trial, the superior court reiterated, "[P]lease argue anything you wish," including questions of law previously settled at summary judgment. The Corporation's counsel stated in opening arguments that the Corporation would "let it play out" and "make objections if we think that he's astray from what we think the issues are." The Corporation never objected to the broadening of issues during trial.

maintained that "just because [the records were] in electronic form shouldn't be an excuse for excluding them from inspection." Pederson also testified that in his experience working for the Corporation, the company maintained an electronic record-keeping system that makes all detailed financial transaction information "easily and quickly" accessible and available at corporate headquarters. The Corporation's counsel stipulated to the fact that "obviously there are financial records, and it is possible for someone to query the system" with little effort to determine, for example, "how much did we spend on paper clips in June." Pederson maintained that he has never been provided the "*actual* books and records of account of the company," as defined above, but rather just the annual financial reports contained within the annual reports and proxy statements, which had "no detail in them." (Emphasis added.) Pederson also argued that "minutes," as used in the statute, include reports and presentations made to the board and its committees even if not typed up in the post-meeting descriptions.

Regarding the confidentiality agreement, Pederson argued that he was entitled to access "[a]ll the books and records directly connected to [his] demands," without redaction, even if he refused to sign a confidentiality agreement. He further argued that even if a corporation may request a confidentiality agreement, the confidentiality agreement in this case was initially overbroad because it encompassed more than what was strictly confidential and was overly restrictive in its requirement that he obtain confidentiality agreements from all potential recipients of information. He specifically argued that because of the proxy disclosure regulations, 3 AAC 08.345, the Corporation can claim no confidentiality with respect to compensation information for at least the top five most highly compensated executives and possibly others who could potentially be on that list if the existing disclosures were incorrect.

The Corporation maintained its position that it possessed no "books and records of account" because it maintained electronic accounting records and that the

annual reports and proxy statements were adequate substitutes to satisfy Pederson's requests. The Corporation also argued that "minutes" include the concise descriptions of what happens in board and committee meetings that are prepared after the meetings but do not include presentations and reports made in those meetings. The Corporation asserted that the confidentiality agreement was "a bit of a sideshow" because it had released everything required under its interpretation of the statute and the proffered confidentiality agreement was to apply only to any additional, voluntarily supplied information.

## G. The Superior Court's Findings Of Fact And Conclusions Of Law

After trial concluded, the superior court issued written findings of fact and conclusions of law and entered final judgment for the Corporation.

On the legal issues related to the scope of inspection under AS 10.06.430, the superior court "adhere[d]" to its determination at summary judgment that the statutory requirement to disclose " 'books and records of account' . . . does not require a corporation to disclose to a shareholder on request *all* of its financial statements, including monthly financial statements, budget documents, records of disbursement, check registers, payments to executives and employees, and electronic records of account." (Emphasis in original.) Rather, "providing the annual certified financial statements satisfied the statutory obligation . . . particularly where a corporation establishes that it has no traditional accounting ledger and its electronic records are extraordinarily voluminous." The superior court concluded that the Corporation established that factual predicate and that release of annual reports thus satisfied the requirements of the statute in this case.

The superior court rejected Pederson's argument that 3 AAC 08.345's proxy-disclosure rules broadened the scope of the inspection right under AS 10.06.430 in order to verify the truth of the disclosures. "[Alaska Statute] 10.06.430 [does not]

require[] an Alaska Native Corporation to provide its shareholders, upon request, different documents than any other corporation covered by AS 10.06.430."

On the specific factual dispute whether Pederson had received all the materials that the Corporation claimed it had delivered to him, the superior court found that Pederson had received the disputed documents, reasoning that "Pederson's testimony [is] not credible" and accepting instead the testimony of a paralegal who prepared the documents. The superior court thus stood by its finding at partial summary judgment that Pederson had received all relevant information, without omission or redaction, within the "minutes" and "books and records of account" as the superior court defined those terms.

The superior court further concluded that a corporation could demand a reasonable confidentiality agreement before releasing inspectable documents and determined that the confidentiality agreement requested by the Corporation was "reasonable" because it "agreed to all of Mr. Pederson's requests except the one that would essentially vitiate the confidentiality agreement and reduce it to a nullity" by permitting Pederson to disclose information to other shareholders without first obtaining a confidentiality agreement from those other shareholders. The superior court never addressed whether it was permissible for the Corporation to label all information requested in Pederson's demand letters "Confidential Information" subject to the terms of the agreement.

Finally, the superior court determined that "there was no delay" and that "the time it took to produce the documents was reasonable" because "[m]ost of the time was taken up with negotiations of a confidentiality agreement between the parties that failed." The superior court also found that after negotiations over the confidentiality agreement "collapsed," the Corporation's assistant corporate counsel "moved as quickly as he could to assemble and provide to Pederson in August 2009 all the documents that

he understood the corporation was statutorily obligated to provide," plus additional documents provided gratuitously.

Pederson appeals.

## III.   STANDARD OF REVIEW

"We review a trial court's legal analysis de novo."[10]  Under the de novo standard of review, we use our independent judgment,[11] and our "duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[12]  When interpreting a statute, we have frequently elaborated that "we must consider its language, its purpose, and its legislative history, in an attempt to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others."[13]

## IV.   DISCUSSION

The right of shareholder inspection is an important method for monitoring agent performance and enhancing principal control over corporate agents.  According to a leading treatise, "the basis for the shareholder's right to inspection is found in the ownership of shares in the corporation and the necessity of self-protection."[14]  Not only does a shareholder have "a fundamental right to be intelligently informed about corporate

---

[10]     *Dan v. Dan*, 288 P.3d 480, 482 (Alaska 2012).

[11]     *E.g.*, *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 908 (Alaska 2001).

[12]     *E.g.*, *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979) (first announcing this verbal formulation); *Casey K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 311 P.3d 637, 643 (Alaska 2013).

[13]     *E.g.*, *Alaska Nat'l Ins. Co. v. Nw. Cedar Structures, Inc.*, 153 P.3d 336, 339 (Alaska 2007) (internal citations and quotation marks omitted).

[14]     5A WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 2213, at 241 (2012).

affairs,"[15] but the shareholder also must have a tool to ensure that the management and board of directors are "discharging their duties" in "good faith" rather than "deliberately keep[ing] the shareholders in ignorance or under misapprehension as to the true condition of affairs."[16] Thus, the shareholder inspection right regulates the agency relationship between corporate shareholders and those whose job it is to represent shareholders' interests at the helm of the corporation.

All corporations suffer from inherent principal-agent tensions, and shareholders need adequate tools to obtain information in order to protect their interests against predation by wayward agents.[17] On the other side of the balance, shareholders have a countervailing interest in permitting the efficient operation of the corporation free from improper meddling and forced disclosure of information that might harm the shareholders.[18] Corporate law governing shareholder access to information balances both interests.[19]

---

[15] *Id.*

[16] *Id.* at 243-44.

[17] *See, e.g.*, Frank H. Easterbrook & Daniel R. Fischel, *Corporate Control Transactions*, 91 YALE L.J. 698, 701 (1982).

[18] *See generally id.* at 701-02 (noting the costs of shareholder monitoring of corporate governance and hypothesizing an optimal balance).

[19] *See* 5A FLETCHER, *supra* note 14, § 2214, at 246-49. The legislative history accompanying Alaska's statutory inspection right states that the statute aims to balance "the tension . . . between the right of a shareholder to gain access to proof of mismanagement or other wrongdoing and the possibility that a shareholder could use this right to vex or harass incumbent management." Legislative Counsel, Sectional Analysis of Proposed Code Revision Bills Revising the Corporations Code, 15th Leg., 1st Sess. at 87 (May 7, 1987), *available in* 1987 House-Senate Joint Journal Supp.

Several mechanisms have been developed for providing shareholders access to corporate information, including unilateral reporting requirements[20] and the common law and statutory rights of shareholders to inspect certain corporate documents. Today, shareholders in every state have the right to inspect certain corporate documents, whether under statute, the common law, or both.[21]

This appeal raises three important groups of issues of first impression in Alaska regarding the scope of the statutory[22] inspection right created by AS 10.06.430: (1) What is the scope of the statutory right for shareholders to inspect "books and records

---

[20] *See, e.g.*, AS 10.06.433 (mandating that corporations issue an annual report containing certain financial information); 3 AAC 08.345(b)(2)(A) (mandating disclosure of five most highly compensated corporate officers in Native corporations' annual proxy solicitations).

[21] 5A FLETCHER, *supra* note 14, § 2213, at 240.

[22] Because we reverse and remand on these statutory grounds, we need not address the existence or nature of a common-law right of shareholder inspection in Alaska.

We note that long before statutory inspection rights, "the courts of king's bench and chancery from an early day" recognized a common-law right "to inspect the books and papers of the corporation, for a proper purpose and under reasonable circumstances." *In re Steinway*, 53 N.E. 1103, 1105 (N.Y. 1899); *see also id.* at 1105-06 (collecting English common-law cases). That traditional common-law right was recognized by virtually all American jurisdictions to have addressed the issue. *Guthrie v. Harkness*, 199 U.S. 148, 153 (1905) ("There can be no question that the decisive weight of American authority recognizes the common-law right of the shareholder, for proper purposes and under reasonable regulations as to place and time, to inspect the books of the corporation of which he is a member."). Whether AS 10.06.430 affirmed and declared or partially or fully replaced or abrogated the common-law right of inspection is a question left for a future case. *See generally* 5A FLETCHER, *supra* note 14, § 2214, at 250-51 (discussing the treatment of this question in other jurisdictions); Browning Jeffries, *Shareholder Access to Corporate Books and Records: The Abrogation Debate*, 59 DRAKE L. REV. 1087 (2011) (same).

of account"? Does that right extend beyond annual reports and proxy statements already submitted to the shareholders each year, and does it include electronically maintained books and records of account? And does the right extend to individual compensation information for corporate executives and board members? (2) What is the scope of the statutory right for shareholders to inspect "minutes"? Does that right extend beyond concise descriptions of the topics discussed and actions taken and include presentations and reports made during the meeting? (3) Under what circumstances, if any, may a corporation condition release of documents on receipt of a confidentiality agreement? What scope and confidentiality protections are reasonable in such a confidentiality agreement?

The superior court erred in its treatment of the first and third issues but correctly decided the second question.

A.    The Superior Court Interpreted The Scope Of "Books And Records Of Account" In AS 10.06.430 Too Narrowly.

Alaska Statute 10.06.430(a) requires a corporation to "keep correct and complete books and records of account . . . in written form or in any other form capable of being converted into written form within a reasonable time." Alaska Statute 10.06.430(b) directs a corporation to make those "books and records of account . . . reasonably available for inspection and copying at the registered office or principal place of business . . . by a shareholder of the corporation . . . at a reasonable time and for a proper purpose," upon "written demand stating with reasonable particularity the purpose of the inspection." Alaska Statute 10.06.430(b) further clarifies that "[o]nly books and records of account [and] minutes . . . directly connected to the stated purpose of the inspection may be inspected or copied."

The superior court ruled that the statutory requirement to disclose books and records of account "does not require a corporation to disclose to a shareholder on

-19-                                                                    6939

request *all* of its financial statements [relevant to the inspection request], including monthly financial statements, budget documents, records of disbursement, check registers, payments to executives and employees, and electronic records of account." (Emphasis in original.) Rather, the superior court reasoned that "providing the annual certified financial statements satisfied the statutory obligation . . . , particularly where a corporation establishes that it has no traditional accounting ledger and its electronic records are extraordinarily voluminous."

On appeal, Pederson argues that the Corporation violated the statute by failing to disclose financial records encompassed within the statutory definition of "books and records of account" and instead substituting less-detailed annual financial reports. Pederson defines "books and records of account" as encompassing "all corporate financial books and records," including electronically maintained financial records, and he argues that it was error for the superior court to substitute "annual reports in lieu of an actual inspection of [the Corporation's] books and records of account."

The Corporation responds that "books and records of account" should be defined "narrowly" because of the Corporation's "interest in being protected against harassment," its interest in guarding against the dissemination of confidential information, and the need to distinguish the shareholder inspection right from the broader inspection right of directors.[23] The Corporation justifies the superior court's ruling that annual reports and proxy solicitation statements satisfied the production requirement for "books and records of account" because the Corporation "maintains no literal 'books and records of account'; all of its financial records are maintained electronically." Because the inspection statute "cannot possibly intend to require corporations to provide

---

[23]   AS 10.06.450(d) ("A director has the absolute right at a reasonable time to inspect and copy all books, records, and documents of every kind . . . .").

shareholders access to a computer so that they may browse the corporation's electronic financial records," the Corporation asks this court to conclude that the Corporation "reasonably used [annual and proxy solicitation statements] that were readily available."[24]

Pederson replies that the Corporation's primary argument for affirmance — that electronic accounting records are voluminous and do not fall within the meaning of "books and records of account" — is "a ludicrous proposition" because "[v]irtually every corporation maintains records electronically," and such a rule would "leave shareholders with virtually no right of inspection of financial information of the Corporation that they own." He also notes that "the inspection statute contemplates that records will be kept in other than written form and requires that they be easily

---

[24] The Corporation also argues that because Pederson argued in the superior court that he was entitled to "*all* relevant documents," regardless of the meaning of "books and records of account," Pederson should be held to have waived for appeal any claim to defining a smaller subset of documents to which he is entitled within the statutory category. The Corporation's forfeiture argument is unavailing for two reasons. First, Pederson argued at trial for a narrower definition of "books and records of account" that would reveal all financial documents without entitling Pederson to all of the Corporation's documents. Second, even if Pederson had advanced only the argument that he was entitled to all relevant documents of the Corporation regardless of the independent limitation of the category of "books and records of account," he would not have thereby forfeited his narrower claim for appeal because the narrower argument is fairly contained within the broader argument. *See Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Motors Corp.*, 221 P.3d 977, 985 (Alaska 2009) ("We have adopted a liberal approach towards determining whether an issue or theory of a case was raised in a lower court proceeding . . . and will consider new arguments on appeal if they are closely related to the trial court arguments and 'could have been gleaned from [the] pleadings.' Key words or phrases do not need to appear in the pleadings in order for us to find that an argument was raised prior to the appeal." (alteration in original) (citations omitted)).

convertible into written form for inspection." Pederson reasons that if the inspection statute allows management "to simply 're-give' annual reports," then it is a nullity.

### 1. "Books and records of account" includes electronic records.

We reject the Corporation's argument that it "maintains no literal 'books and records of account' " within the meaning of AS 10.06.430 because "all of its financial records are maintained electronically." Alaska Statute 10.06.430(a) specifically contemplates electronic storage of inspectable records, requiring a corporation to "keep correct and complete books and records of account . . . in written form or in any other form capable of being converted into written form within a reasonable time." It is manifest that electronic records are included within the statutory definition of "books and records of account."

The Corporation argues that we should avoid this holding for fear that "the statute [would] require corporations to provide shareholders access to a computer so that they may browse the corporation's electronic financial records." But Pederson never asked to use a computer to browse the Corporation's accounting software. Rather, he asked for copies of documents containing specific information, copies that could be (and, under the statute, must be capable of being) printed in writing.

The Corporation also argues that the scope of "books and records of account" should be narrowly construed to protect corporate interests in confidentiality. But we decline to override clear statutory text, which includes electronic documents in "books and records of account," on such policy grounds, especially when other avenues exist for protecting legitimate confidentiality interests.[25] Finally, the Corporation argues that electronic financial records are somehow less accessible than printed ledgers and that this alleged fact is legally relevant to the issue of what is included in "books and records

---

[25]     *See infra* section IV.C.

of account." But the Corporation stipulated at trial to the fact that its electronic system of financial recordkeeping "obviously [contains] . . . financial records, and it is possible for someone to query the system" with little effort to determine, for example, "how much did we spend on paper clips in June." And even if electronic accounting records were somehow less accessible than traditional printed ledgers, the inaccessibility of documents is not relevant to the legal determination of what documents fall within "books and records of account," because, as a leading treatise notes, "the corporation cannot fail to keep books and thus avoid the statutory penalty."[26]

Alaska Statute 10.06.430(a) directs that corporations "shall keep correct and complete books and records of account." The Corporation does so, electronically. We conclude that the electronic nature of the Corporation's books has no bearing on the legal issue in this case: the scope of "books and records of account" under AS 10.06.430. If the Corporation is correct that Pederson was entitled to only annual and proxy reports along with the minutes, then it must find support on alternative grounds.

**2. "Books and records of account" goes beyond the information contained in annual reports and proxy solicitation statements.**

The phrase "books and records of account" used in AS 10.06.430 must extend beyond mere annual reports in order to give meaning to the statutory language and avoid statutory surplusage. A separate provision in the corporations code, AS 10.06.433(a), already requires that corporations send shareholders an "annual report" that "must contain a balance sheet as of the end of the fiscal year and an income

---

[26] 5A FLETCHER, *supra* note 14, § 2257, at 459; *see also id.* § 2239, at 380-81 ("Where a statute requires a corporation to keep books showing certain matters for inspection of shareholders, a shareholder cannot be deprived of the right to inspect them because they are kept in a particular way or because they contain, besides the information to which the shareholder is entitled, other information that the shareholder has no right to demand.").

statement and statement of changes in financial position for the fiscal year, accompanied by a report on the fiscal year by independent accountants or, if there is no such report, the certificate of an authorized officer of the corporation that the statements were prepared without audit from the books and records of the corporation." To interpret AS 10.06.430(b) to require no more than what is already required by AS 10.06.433(a) would be to violate the presumption " 'that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous.' "[27] It is especially clear that the legislature intended for the shareholder inspection requirement of AS 10.06.430(b) to have effect beyond the annual-reporting requirement of AS 10.06.433(a) because both requirements were part of the same statutory section in the original 1957 statute.[28]

If the provision of annual reports could satisfy a demand to inspect "books and records of account," several statutory limitations on the scope of a shareholder's inspection demand would make little sense, including the statutory requirements that the shareholder's request state a "proper purpose" and that only documents "directly connected to [that] purpose" will be inspectable.[29] Those limitations make sense only if the scope of inspectable documents within "books and records of account" goes beyond

---

[27] *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 761 (Alaska 1999) (quoting *Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 530-31 (Alaska 1993)).

[28] *See* Ch. 126, § 46, SLA 1957 (codified at former AS 10.06.240) (including the original shareholder-inspection provision as well as the following provision: "Upon the written request of any shareholder of a corporation, the corporation shall mail to such shareholder its most recent financial statements showing in reasonable detail its assets and liabilities and the results of its operations.").

[29] AS 10.06.430(b).

mere annual reports and proxy statements, which are released to all shareholders each year.

For these reasons, at least two other jurisdictions have recognized that the shareholder right to inspect "books and records of account" extends well beyond the distinct statutory right to receive annual reports.[30]  Similarly, we conclude that Pederson's statutory right of inspection of "books and records of account" extended beyond the annual reports and proxy statements provided by the Corporation in this case. And Pederson's statutory right of inspection was not satisfied by offering annual reports and proxy statements as substitute documents when his right reached beyond those documents.[31]  "Where the right of inspection exists, refusal of it cannot be justified by proffering the shareholders a substitute . . . ."[32]

The superior court, in holding that the annual reports and proxy statements sufficed under AS 10.06.430(b), relied entirely on the fact that the Corporation "has no traditional accounting ledger and its electronic records are extraordinarily voluminous," concluding that it therefore should be excused from actually producing its accounting records.  But as we conclude above, the electronic nature of the documents is entirely irrelevant to whether documents are inspectable "books and records of account."

---

[30]   *See Jara v. Suprema Meats, Inc.*, 18 Cal. Rptr. 3d 187, 206 (Cal. App. 2004); *Morgan v. McLeod*, 253 S.E.2d 339, 342-43 (N.C. App. 1979).

[31]   *See Moore v. Rock Creek Oil Corp.*, 59 S.W.2d 815, 819 (Tex. Comm'n App. 1933) ("Defendants in error are not entitled to defeat plaintiffs in error's statutory right of inspection by offering them the substitute of financial statements issued by the company or an auditor's report made at its instance. . . . [Shareholders] cannot be required to accept a substitute in the way of financial statements and auditor's reports which may be believed by the corporation's officers to be just as good as the statutory right of examination.").

[32]   5A FLETCHER, *supra* note 14, § 2249, at 412.

Accordingly, we conclude that provision of annual reports and proxy statements did not provide an adequate substitute to furnishing the actual books and records of account inspectable pursuant to Pederson's demand letters.

### 3. "Books and records of account" includes detailed accounting documents, including individual executive compensation information.

The statutory phrase "books and records of account" encompasses monthly financial statements, records of receipts, disbursements and payments, accounting ledgers, and other financial accounting documents, including records of individual executive compensation and transfers of corporate assets or interests to executives. Such information is crucial to the shareholders' ability to monitor the performance of their corporate agents and protect their interests as shareholders.[33]

At least five of our sister states have interpreted their inspection rights to run to individual executive compensation information.[34] The Corporation identifies no

---

[33] *See supra* text accompanying notes 14-19 (discussing the policy interests animating the right of shareholder inspection).

[34] *See Schluter v. Merritt Chapman & Scott*, No. 4828, 4 Del. J. Corp. L. 234 (Del. Ch. Nov. 20, 1975) (holding that shareholder request for books and records "dealing with . . . [t]he salary or other compensation being paid the corporation's officers and directors," *id.* at 235, was valid and ordering production of the information, *id.* at 236); *Weigel v. O'Connor*, 373 N.E.2d 421 (Ill. App. 1978) (holding that shareholder's request to inspect records that would allow the shareholder "to determine the amount and kind of compensation paid to corporate officers and directors" in order "to allow informed voting by minority shareholders at future meetings," *id.* at 424, was valid and that after a proper purpose was shown the trial court erred by limiting the right of inspection to exclude such information, *id.* at 428); *Winger v. Richards-Wilcox Mfg. Co.*, 178 N.E.2d 659 (Ill. App. 1961) (holding that a shareholder's request to inspect "officers' and directors' salaries, bonuses, retirement plans and expense accounts" to determine their legality and reasonableness, *id.* at 663, was "proper," *id.* at 665, granting summary judgment in the shareholder's favor and declaring that the shareholder is

(continued...)

cases from other jurisdictions holding that individual compensation information is *not* inspectable as "books and records of account." The Corporation attempts to undermine the persuasive value of the cases holding compensation information to be inspectable by complaining that "[f]ew [of these cases] are modern" and observing that some "date from the 1930s." But no modern cases seem to cut in the other direction. And these seminal cases interpret statutes in other states that closely resemble Alaska's *current* statute. Indeed, we find it particularly persuasive that the Illinois courts have held that individual executive compensation information is inspectable pursuant to its statute[35] because Illinois's inspection statute and the case law interpreting it formed the basis for the Model Business Corporations Act that Alaska adopted in 1957.[36]

---

[34](...continued)
"entitled to the writ of mandamus" to view the requested information, *id.* at 666); *Cooke v. Outland*, 144 S.E.2d 835, 837 (N.C. 1965) (assuming that "books and records of account" as used in the statute, or the common-law right of inspection, could include deposit accounts and loans between bank and its officers, managers, and directors, notwithstanding confidentiality concerns); *Meyer v. Ford Indus., Inc.*, 538 P.2d 353 (Or. 1975) (holding that shareholder's request for documents detailing corporation's contributions to retirement plan, purchase agreements for shares in other corporations, and specific compensation information for a former employee, *id.* at 354-55, was valid and that the shareholder "had the right . . . to inspect all of such items," *id.* at 358); *Donna v. Abbotts Dairies, Inc.*, 161 A.2d 13 (Pa. 1960) (holding that corporation complied with its obligations under the statute, *id.* at 17, when it offered books and records of account "insofar as they show such matters as . . . [c]ompensation to officers and counsel" and "[d]isbursements by the company in connection with any matters mentioned in [the shareholder's] letter," *id.* at 16).

[35]     *See Weigel*, 373 N.E.2d at 424; *Winger*, 178 N.E.2d at 663.

[36]     The Model Business Corporations Act, first drafted in 1946, was based largely on a preexisting statute in Illinois with which the Model Act's drafters were intimately familiar as practitioners. *Meyer*, 538 P.2d at 355-56 & n.7. Oregon's Supreme Court has held that "upon the adoption of that Model Act the Oregon legislature
(continued...)

Accordingly, we reverse the superior court's contrary conclusions regarding the scope of "books and records of account" and remand for further proceedings in accordance with this opinion. We note that our holding does not depend on the Corporation's status as an Alaska Native corporation or Pederson's status as a shareholder of an Alaska Native corporation. Pederson may be correct that regulations promulgated by the State and applying to Alaska Native corporations, 3 AAC 08.345(b)(2)(A),[37] provide him with an additional proper purpose for inspection not available in the same way to shareholders of other corporations. But the Corporation does not dispute Pederson's proper purpose on appeal. The scope of "books and records of account" relies on nothing unique to the factual circumstances of this case.

## B. The Superior Court Correctly Interpreted The Meaning Of "Minutes" In AS 10.06.430.

Alaska Statute 10.06.430(a) also requires a corporation to keep "correct and complete . . . minutes of proceedings of its shareholders, board, and committees of the board." Alaska Statute 10.06.430(b) conveys to shareholders the right to inspect those

---

[36](...continued) intended that this provision of that Act should be interpreted and applied in the same manner as intended by the drafters of that Model Act." *Id.* at 358. Alaska's legislature created the statutory inspection right in 1957, *see* ch. 126, § 46, SLA 1957 (codified at former AS 10.05.240), and based it on the Model Business Corporations Act, *see* Legislative Counsel, Sectional Analysis of Proposed Code Revision Bills Revising the Corporations Code, 15th Leg., 1st Sess. at 89 (May 7, 1987), *available in* 1987 House-Senate Joint Journal Supp.

[37] "The solicitation of proxies on behalf of the board [of an Alaska Native corporation] must be preceded or accompanied by a dated, written proxy statement including . . . a statement of all current remuneration distributed or accrued and of all future remuneration contributed during the corporation's last fiscal year on behalf of . . . each of the five most highly compensated directors or officers for the director's or officer's services in all capacities to the corporation and its subsidiaries, naming each such person . . . ."

minutes under the same conditions as it grants the right to inspect "books and records of account."

The superior court implicitly concluded that the Corporation's duty to disclose "minutes" was satisfied in this case when the Corporation provided Pederson with the post hoc descriptions of what was discussed and decided in board meetings but withheld presentations and reports made to the board. On appeal in this court, Pederson and the Corporation primarily focus on the meaning of "books and records of account," addressing the meaning of "minutes" only briefly. Pederson argues that "minutes" must include "all of the documents contained in the minute books of the Corporation," which must include "any contracts or agreements approved, or documents or reports used to reach a decision." Specifically, Pederson claims that the actual terms of a deal transferring "millions of dollars worth of stock to two executives" must be part of the minutes in this case and that the Corporation cannot provide merely "a brief reference to the Board discussing [the deal]." The Corporation responds that the term "minutes" "is commonly understood to mean 'the written record of an official proceeding' " and that minutes "generally do not encompass documents distributed to committee members before or at the meeting or copies of presentations made at meetings."

We find no support for Pederson's expansive definition of "minutes" in the relevant authorities. *Black's Law Dictionary* defines "minutes" and "minutes book" as including notes of the proceedings of a meeting and actions taken therein.[38] A prominent treatise states that

---

[38] BLACK'S LAW DICTIONARY 1087 (9th ed. 2009) (defining "[m]inutes" as "[m]emoranda or notes of a transaction, proceeding, or meeting"); *id.* (defining "[m]inute book" as "[a] record of the subjects discussed and actions taken at a corporate directors' or stockholders' meeting").

[t]he minutes should clearly and certainly record the transactions and proceedings as they actually occurred and should definitely and positively show what action was taken by the corporation in the matters that they purport to memorialize. As a general rule, they should show the date when the meetings were held and those present. It is not necessary to show the vote by which a matter was adopted; a recital that the matter was adopted is sufficient. It is ordinarily not essential for contracts entered into pursuant to a resolution duly adopted and recorded as such in the minutes to also be copied into the minutes. A secretary is not obligated to include everything that is said in the minutes as long as the secretary accurately transcribes what has taken place.[39]

We therefore hold that the statutory category "minutes" does not ordinarily encompass presentations or reports made to the board but rather merely requires a record of the subjects discussed and actions taken at the meeting, which must be faithfully recorded.[40] Accordingly, we affirm the superior court's implicit definition of the meaning of "minutes" in AS 10.06.430.

---

[39]     5A FLETCHER, *supra* note 14, § 2190, at 163-64 (citations omitted).

[40]     We do not mean to foreclose the possibility that a party may also be entitled to inspect a specific attachment that has been incorporated into or attached to the minutes. We also note that contrary to the testimony of the Corporation's assistant corporate counsel at trial, the content of "minutes" is not at the sole discretion of the corporation based on what it chooses to type up after a meeting. A corporation could not, for example, fail to record an action of the board or a subject discussed at a board meeting simply because it decided in its discretion not to include it in the minutes following the meeting.

**C.    A Corporation May Not Demand A Confidentiality Agreement That Is Unreasonably Broad In Defining The Scope Of What Is Confidential Or Contains Unreasonably Restrictive Confidentiality Provisions.**

Some books and records of account and other categories of inspectable documents directly relevant to a shareholder's demand stating a proper purpose could, if released to the general public, harm the interests of the shareholders. Several tools exist in the law to protect sensitive information within the bounds of the inspection statute. But shareholders who have established a right to inspect corporate information ordinarily may not be denied that right merely because "the information sought is of a confidential nature."[41] And here, the Corporation demanded that Pederson accede to an unreasonable confidentiality agreement. It therefore constructively denied his inspection right to any information that he would have otherwise been entitled to receive under the statute.

Two tools for protecting against the detrimental distribution of sensitive information are particularly well established in the law. First, a corporation can challenge the inspectability of the information in the first place, such as by challenging the shareholder's proper purpose, challenging the assertion that the information is directly connected to the proper purpose, or challenging the inclusion of the information within the category of inspectable books or records of account. In particular, the

---

[41]    *Nationwide Corp. v. Nw. Nat'l Life Ins. Co.*, 87 N.W.2d 671, 679 (Minn. 1958); *see also Fears v. Cattlemen's Inv. Co.*, 483 P.2d 724, 730 (Okla. 1971) ("We agree with the holding of the Supreme Court of Minnesota, in [*Nationwide*,] . . . that the fact that the information sought by a stockholder under the statute involved is of a confidential nature is not enough, in itself, to deny the statutory right of examination of records and making extracts or abstracts therefrom.").

statutory requirement that a shareholder have a "proper purpose" for inspecting the requested documents[42] functions as a confidentiality protection.

Confidential information is subject to inspection only insofar as it directly relates to the shareholder's proper purpose *as a shareholder.* A respected treatise notes that shareholders "are not entitled to possession of trade secrets and confidential communications unless that information affects the financial status or value of their stock in some way."[43] Thus, "analyses or tentative studies in the nature of confidential interoffice communications" are generally not within the scope of a shareholder's inspection right because a shareholder would generally have no proper purpose in inspecting them related to the shareholder's interests as a shareholder.[44] This proper-purpose protection for confidential information helps to ensure that "the information will not be used to the detriment of the corporation or to give a competitor an unfair advantage."[45] For example, we find it hard to imagine the proper purpose that a shareholder would have, as a shareholder, to inspect the secret formula for Coca-Cola. Where a corporation has good cause to doubt a shareholder's proper purpose,[46] the

---

[42]    AS 10.06.430(b).

[43]    5A FLETCHER, *supra* note 14, § 2239.10, at 381.

[44]    *Id.* at 382.

[45]    *Id.* at 382-83; *see also, e.g.*, *Keeneland Ass'n v. Pessin*, 484 S.W.2d 849, 852 (Ky. App. 1972) ("We do not believe that an intent to destroy a corporation, to bring vexatious suits, or to take unfair advantage for competition reasons could be included in the phrase 'proper corporate purpose.' ").

[46]    "The possibility of the abuse of a legal right affords no ground for its denial." *Guthrie v. Harkness*, 199 U.S. 148, 156 (1905). Accordingly, the corporation must show something more than the mere possibility of abuse in order to deny the inspection request on those grounds.

corporation may refuse to honor the shareholder's inspection request on that ground and may raise the lack of a proper purpose as a defense to a shareholder's claim under the statute. Or the corporation may seek declaratory relief as to the shareholder's improper purpose and lack of entitlement to inspection.

A second well-established tool for protecting against the adverse dissemination of sensitive information is the ability of a court to condition the remedy of compelled disclosure of documents on reasonable confidentiality provisions. In the course of resolving a lawsuit about what information is subject to inspection, a court, exercising its discretion in granting the remedy of mandamus and compelling the production of records, may include reasonable protective orders safeguarding the use and dissemination of sensitive information to ensure that the information to which a shareholder has a right is used only for the shareholder's proper purpose as a shareholder and does not do damage to the company.[47] For example, a court considering whether to issue a writ of mandamus might order that a neutral third party conduct the inspection

---

[47] 5A FLETCHER, *supra* note 14, § 2255, at 449 ("In awarding the writ, it is proper to impose such restrictions upon the exercise of the right as may seem necessary for the protection of the interests of the parties, and to safeguard the books and their contents."); *id.* § 2220, at 286 ("If the court is concerned that the shareholder may abuse the inspection rights, it can place any reasonable restrictions or limitations on the exercise of the rights that it deems proper."); MODEL BUSINESS CORPORATIONS ACT § 16.04(d) ("If the court orders inspection and copying of the records demanded, it may impose reasonable restrictions on the use or distribution of the records by the demanding shareholder."); *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 820 (Del. Ch. 2007) ("In determining stockholder inspection rights . . . , this Court may 'in its discretion, prescribe any limitations or conditions' that it deems necessary to 'protect the corporation's legitimate interests and prevent possible abuse.' One such condition has become common. '[I]t is customary for any final order . . . to be conditioned upon a [reasonable] confidentiality [agreement].' " (alterations in original) (internal citations and footnotes omitted)).

of sensitive information,[48] include in the order terms "necessary to prevent a disclosure of the corporation's trade or business secrets to its competitors,"[49] or provide that the parties "shall enter into such reasonable confidentiality agreement as [the corporation] may request."[50] In some states, such as Delaware, there is even a presumption that a court will as a matter of course condition its order mandating production of confidential information on reasonable confidentiality protections.[51] But some courts, including the Delaware Court of Chancery, recognize that shareholders must be able to publicly disclose confidential information in at least some circumstances in order to effectuate their proper purposes, such as suing the corporation or its directors or officers for mismanagement, violation of disclosure rules, or for breach of a fiduciary duty.[52]

This case does not involve either of these two confidentiality protections.[53] Rather, it presents the questions when and whether a corporation may make use of a third tool: unilaterally demanding that the shareholder accede to a confidentiality agreement

---

[48]     *See, e.g.*, *News-Journal Corp. v. State ex rel. Gore*, 187 So. 271, 272 (Fla. 1939); *Thornton ex rel. Laneco Constr. Sys., Inc. v. Lanehart*, 723 So. 2d 1113, 1117 (La. App. 1998).

[49]     *E.g.*, *Drake v. Newton Amusement Corp.*, 9 A.2d 636, 638 (N.J. 1939); *see also Nationwide Corp. v. Nw. Nat'l Life Ins. Co.*, 87 N.W.2d 671, 682 (Minn. 1958); *Dyer v. Indium Corp. of Am.*, 770 N.Y.S.2d 184, 185 (N.Y. App. Div. 2003).

[50]     *E.g.*, *No-Burn, Inc. v. Murati*, No. 24577, 2009 WL 5174077, at *2 (Ohio App. Dec. 31, 2009); *see also Panitz v. F. Perlman & Co., Inc.*, 173 S.W.3d 421, 431 (Tenn. App. 2004) (reviewing the reasonableness of a confidentiality agreement the court ordered the parties to agree to).

[51]     *Disney v. Walt Disney Co.*, 857 A.2d 444, 447-48 (Del. Ch. 2004).

[52]     *Id.* at 448-49.

[53]     The Corporation stipulated to Pederson's proper purpose to inspect the documents and did not seek court-ordered confidentiality protections.

before the corporation releases information. The Corporation in this case demanded, as a precondition to release of any documents, that Pederson accede to confidentiality agreements that would (1) cover *all* of the information to be released, and (2) either hold Pederson liable for improper disclosures made by other shareholders with whom he might share the information or require Pederson to obtain confidentiality agreements with each shareholder with whom he intended to share the information. The Corporation argues that it is entitled to require such a confidentiality agreement before producing otherwise-inspectable documents. Pederson argues that the proper-purpose requirement and court-imposed remedial conditions are the only ways in which a corporation may protect sensitive information from inspection and that a corporation may not sua sponte demand a confidentiality agreement *ex ante* and wield refusal to accede as a shield to liability. The superior court held that the Corporation "could request a confidentiality agreement if sensitive materials were requested" so long as the terms thereof were "reasonable" and that "the requested confidentiality agreement [was] reasonable."

It may be appropriate for a corporation to demand a confidentiality agreement provided that it (1) reasonably defines the scope of what is confidential information subject to the agreement and (2) contains confidentiality provisions that are not unreasonably restrictive in light of the shareholder's proper purpose and the corporation's legitimate confidentiality concerns.[54] If the shareholder refuses to sign

---

[54]     Neither Pederson nor the Corporation identifies any cases from our sister jurisdictions supporting their positions about the ability or inability of a corporation to unilaterally demand a reasonable confidentiality agreement. Rather, the litigants cite inapposite cases regarding the irrelevant and uncontroversial proposition that a court may condition its remedial order on the imposition of reasonable confidentiality protections. The leading treatise, 5A FLETCHER, *supra* note 14, does not address this question. We conclude that a corporation may unilaterally demand a reasonable confidentiality agreement because there is no indication that AS 10.06.430 prohibits such a demand.

(continued...)

such a confidentiality agreement, the corporation may then refuse to release confidential information and either institute a declaratory action seeking a court order containing reasonable confidentiality protections[55] or await the shareholder's exercise of legal options. And if, as in this case, the shareholder believes that the corporation's proffered confidentiality agreement is not reasonable, the shareholder may refuse to sign and may bring an action against the corporation alleging that the imposition of an unreasonable confidentiality agreement was a constructive denial of an otherwise-proper shareholder inspection demand.[56]

We conclude that the Corporation's proffered agreements were not reasonable as to the scope of application and the breadth of confidentiality protections.

First, the proffered confidentiality agreements purported to subject "[a]ll" of the information to be released to the terms of the confidentiality agreement, without any attempt to differentiate between confidential and non-confidential information. We

---

[54](...continued)
Indeed, the legislative history indicates that the legislature may have intended to give corporations just such a tool. *See* Legislative Counsel, Sectional Analysis of Proposed Code Revision Bills Revising the Corporations Code, 15th Leg., 1st Sess. at 88 (May 7, 1987), *available in* 1987 House-Senate Joint Journal Supp. ("Prior to acceding to the [inspection] demand, the corporation has a right to demand and receive assurances that the information disclosed is not used for the purpose of injuring corporate business . . . ." (citation omitted)).

[55]    *See, e.g.*, *Bank of Heflin v. Miles*, 318 So. 2d 697, 699 (Ala. 1975) (involving a corporation bringing a declaratory action to clarify the scope of the inspection right in a given case and condition remedy on appropriate confidentiality protections).

[56]    A corporation's unreasonable delay in providing inspection is constructive denial of the inspection right. 5A FLETCHER, *supra* note 14, § 2248, at 405 ("[R]efusal may . . . be implied from conduct or evasion. Frustration or evasion of the demand may, in effect, be equivalent to the refusal of a demand made.").

conclude that it is unreasonable to designate as confidential all information subject to an inspection request without differentiating between confidential and non-confidential portions of the requested information or explaining why the corporation has good cause to believe that all of the information sought is confidential. There are many cases interpreting the meaning of "confidential information" in the context of a court's remedial orders pursuant to a shareholder's inspection demand. In those cases, "confidential information" may include those documents that are "candid" in the sense of being prepared by the corporation with a reasonable expectation of confidentiality;[57] documents that reveal preliminary deliberations, assessments, or speculation rather than final action, decisions, or outcomes;[58] and documents whose confidentiality has actually been maintained.[59] "Confidential information" may exclude at least that information that the shareholder already knew, developed independently, acquired from a third party not under an obligation not to disclose the information, or acquired from the public domain.[60] Because the Corporation's proffered confidentiality agreements in this case made no attempt to differentiate confidential from non-confidential information on a reasonable basis, we hold that the scope of the agreements was unreasonably broad. In particular, it would be difficult for the Corporation to argue that it has a confidentiality interest in

---

[57] *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 821 (Del. Ch. 2007); *Disney v. Walt Disney Co.*, 857 A.2d 444, 448 (Del. Ch. 2004) ("There is little doubt that those who participated in these communications had a reasonable expectation that they would remain private unless disclosed in the course of litigation or pursuant to some other legal requirement.").

[58] *See Disney*, 857 A.2d at 448.

[59] *See Pershing*, 923 A.2d at 822-23.

[60] *Panitz v. F. Perlman & Co., Inc.*, 173 S.W.3d 421, 422, 431 (Tenn. App. 2004).

the compensation it pays to its five most highly compensated officials in light of the mandatory disclosure requirements of the pertinent state regulation.[61]

Second, the proffered confidentiality agreements contained unreasonably restrictive confidentiality protections. The first proposed agreement would have permitted disclosure "to other shareholders" and their agents but would have made Pederson liable to the Corporation for unauthorized disclosure by those third parties. The second proposed agreement would have permitted disclosure to proper third parties but would have required Pederson to "obtain . . . a confidentiality agreement . . . that subjects [the person to whom Pederson seeks to disclose confidential information] to the same restrictions imposed on [Pederson] in this Agreement." The superior court concluded that it was reasonable for the Corporation's final draft confidentiality agreement to require Pederson to obtain a confidentiality agreement from each shareholder before disseminating confidential information to that shareholder, reasoning that without such protections, the confidentiality agreement would be "a nullity." But Pederson maintains that the confidentiality restrictions in both drafts were unreasonably restrictive of his proper purpose of organizing his fellow shareholders to alter corporate governance to restrict the transactions that he alleges have occurred.

We conclude that the confidentiality provisions in both the first and second proffered confidentiality agreements were unreasonably restrictive, at least as they related to executive compensation and stock interests, and they would have placed a great burden on Pederson's exercise of his proper purpose of making use of disclosed information to organize his fellow shareholders to restrict those types of transactions. The marginal benefits of the confidentiality restrictions to the Corporation's interests in maintaining confidentiality regarding executive compensation did not outweigh those

---

[61]      3 AAC 08.345(b)(2)(A).

harms.[62] Again, this is particularly true given the state regulation that requires the corporation to disclose the compensation of its five most highly compensated executives.[63]

Accordingly, we reverse the superior court's contrary findings of fact and conclusions of law regarding the reasonableness of the confidentiality agreements in this case and remand for further proceedings in accordance with this opinion.

## V. CONCLUSION

For these reasons, we REVERSE the superior court's judgment, VACATE the superior court's findings of fact and conclusions of law, and REMAND for further proceedings consistent with this opinion.

---

[62] *See Pershing*, 923 A.2d at 821 (determining the reasonableness of a court's remedial confidentiality order by balancing the marginal benefits of the confidentiality provision to the shareholders' interests against the marginal costs in terms of the shareholder's ability to make use of information to which she is entitled).

[63] 3 AAC 08.345(b)(2)(A).