Lee WILLIAMS, Appellant,

v.

Larry FAGNANI, Appellee.

No. S–13294.

Supreme Court of Alaska.

March 5, 2010.

Hal P. Gazaway, Anchorage, for Appellant.

Randall G. Simpson, Greg Dorrington, Jermain Dunnagan & Owens, P.C., Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, WINFREE and CHRISTEN, Justices, and MATTHEWS, Senior Justice pro tem.*

*OPINION*

MATTHEWS, Senior Justice pro tem.

This case is before us for a second time. In our first decision we held that Lee Williams was entitled to an implied roadway easement over property owned by Larry Fagnani.[1] On remand the superior court ruled that Fagnani was entitled to maintain a locked gate across the roadway, so long as Williams was advised of the combination.

Williams's challenge to this ruling is the main issue now before us. We vacate the ruling and remand with instructions that the superior court determine the facts relevant to the inconvenience that the gate will cause Williams and to Fagnani's justification for the gate. When these facts are determined the court should decide whether the gate unreasonably interferes with Williams's use of the roadway easement.

Williams also argues that the superior court should have awarded him enhanced attorney's fees and that the amount actually awarded was miscalculated. We conclude that the court did not abuse its discretion in

---

* Sitting by assignment under article IV, section 11 of the Alaska Constitution and Administrative Rule 23(a).

1. *Williams v. Fagnani,* 175 P.3d 38 (Alaska 2008).

declining to award enhanced fees, but that a minor calculation error was made that should be addressed on remand.

## I. THE GATE ISSUE

On remand the superior court entered an order addressing the particulars of the roadway easement. At the outset the court noted that the scope of the easement was in dispute and had to be determined because it had not been considered during the trial. The court then ruled as follows:

All parties seem to agree that the existing road is a 30 foot gravel road. The widening and graveling of the road benefitted all of the users of the road including both the dominant and servient estates. The Court finds that the improvement of the road was a part of the normal development of the dominant estate. Although widened and improved, the road continued to be a private road and was never a public road.

Based on these facts, this Court finds that Williams is entitled to an implied easement over the disputed road. The easement is limited to 30 feet in width. The easement shall be maintained in its current nature, i.e. a gravel road. Williams is not entitled to more intensive use than he now has. Both Williams and Fagnani have a joint obligation to contribute jointly to the costs reasonably incurred for repair and maintenance of the road. Because the road is a "private" road Fagnani is entitled to post signs and to maintain a gated entrance with locks with combinations that allows Williams' access but prevents use by the general public to create a right of way.

Williams moved for reconsideration of this order. He argued that when he purchased the landlocked property there was no gate on the roadway. He argued further that no justification for a gate existed because Fagnani's house is reached from a different driveway, the property crossed by the roadway is not fenced, and no buildings or personal property of value are accessible from the roadway. Williams also argued that he and his wife are seriously inconvenienced by the gate, noting that they are in their late fifties and Mrs. Williams has a bad knee. He described problems regarding the location of the gate as follows:

The approach of the subject road to Hollywood Road is up a steep embankment slope. After their entry onto Hollywood Road, the Williams must cross two lanes before they would be able to stop. There is no pull out and a very limited shoulder on which they may stop. One must exercise great care traveling down Hollywood Road. Frequently people travel the road at speeds of over 50 miles per hour.

To open and close the gate, it will be necessary to stop some fifty feet from the gate, walk up the steep slope, open the gate, walk back down the road, drive through the gate, stop on an arterial road and walk back across the road to shut and lock the gate. This creates a significant safety hazard. The gate provides no security for any property owned by Mr. Fagnani. It only serves to inconvenience the Williams.[2]

Fagnani opposed Williams's motion for reconsideration. He argued that any burden imposed on Williams's use of the roadway by the gate was justified by the need to prevent others, primarily owners of neighboring homesteads, from using the roadway: "the Kutils, Boyd Connolly and even Williams have not yet internalized the distinction that 'this [road] is a private place....' A padlocked gate on Fagnani's private road is the only way to convey to the Kutils, Boyd Connolly and the general public this simple fact." (First alteration in original.) (Citation omitted.) In addition, Fagnani minimized the inconvenience that the gate would cause Williams: "With full access to the combination on the lock of the gate, the sole burden he faces is getting out of his vehicle, remembering the combination of the lock, opening the gate and driving through. Williams makes unsupported claims that stopping and opening the gate will expose him to 'dan-

2. Williams's allegations concerning the easement, its relationship to Fagnani's property, and the details of the inconvenience it caused the Williamses were presented in an unverified memorandum without record citations.

ger.'" Fagnani also observed that Williams "uses the property primarily as a recreational home and lives in Anchorage full time."[3]

The superior court denied Williams's motion for reconsideration in an order that provided: "The easement established is not a general public easement. Testimony at trial established that members of the public did and would use the easement although it is private. A gate as currently established does not impose an unreasonable burden on the Williams' right of passage." In accordance with this ruling, the court entered a final judgment granting Williams a thirty-foot easement across Fagnani's property, requiring Williams and Fagnani to mutually share the cost of maintaining the easement, and allowing Fagnani to maintain a locked gate.

On appeal the parties largely repeat the arguments they presented to the superior court. Williams contends that the gate unreasonably restricts his use of the easement while providing no significant benefit to Fagnani.[4] Fagnani argues that the gate is a minor burden on Williams's use and is justified by Fagnani's interest in preventing trespassers from using the easement.

The purpose of the implied roadway easement was to provide normal vehicular access to Williams's property.[5] Fagnani, as the owner of the servient estate, is entitled to make any use of the easement that does not unreasonably interfere with this purpose.[6]

The Restatement (Third) of Property: Servitudes, section 4.9, provides: "Except as limited by the terms of the servitude ..., the holder of the servient estate is entitled to make any use of the servient estate that does not unreasonably interfere with enjoyment of the servitude."

The commentary to section 4.9 of the Restatement makes clear that section 4.9 serves as an aid to determining the intent or expectations of the parties in creating a servitude.[7] The commentary goes on to explain:

> Actions that make it more difficult to use an easement, that interfere with the ability to maintain and repair improvements built for its enjoyment, or that increase the risks attendant on exercise of rights created by the easement are prohibited ... unless justified by needs of the servient estate. In determining whether the holder of the servient estate has unreasonably interfered with exercise of an easement, the interests of the parties must be balanced to strike a reasonable accommodation that maximizes overall utility to the extent consistent with effectuating the purpose of the easement.... [8]

There are numerous cases from other jurisdictions involving questions of whether a servient easement owner can erect and maintain a closed or locked gate across a roadway easement.[9] A treatise has summarized the general rules that can be derived from the case law concerning gating an easement:

3. Fagnani's assertion on this point was unverified and not accompanied by record citations.

4. Williams also argues that the superior court erred in defining the scope of use of the easement on the grounds that doing so violated the mandate of this court and violated the law of the case doctrine. Neither contention has merit. Our opinion left open the scope of the implied easement. *Williams,* 175 P.3d at 42 ("We will therefore not address the scope of the implied easement here."). Although Fagnani filed a petition for rehearing in this court asking that issues as to the scope of the easement be considered, this petition was denied without comment. The denial of a petition for rehearing establishes no law binding on the trial court after remand. *Ruggles ex rel. Estate of Mayer v. Grow,* 984 P.2d 509, 513 (Alaska 1999). Thus the denial of the petition for rehearing did not establish the law of the case, and the superior court did not violate

the law of the case doctrine by addressing the easement's scope.

5. *Williams,* 175 P.3d at 40–41.

6. *Labrenz v. Burnett,* 218 P.3d 993, 1002 (Alaska 2009) ("[T]he owner of the servient estate may utilize the easement area in any manner and for any purpose that does not unreasonably interfere with the rights of the easement holder.") (quoting Jon W. Bruce & James W. Ely, Jr., The Law of Easements and Licenses in Land § 8.20, at 8–60 (2009)).

7. Restatement (Third) of Property: Servitudes § 4.9 cmt. a (2000).

8. *Id.* cmt. c.

9. See cases collected in the Reporter's note to § 4.9 of the Restatement, pp. 588–91.

Absent an express arrangement for an open way, courts generally permit a landowner to maintain an unlocked gate if such structure is necessary for the enjoyment of the servient estate. For example, use of the burdened land to raise cattle or for other agricultural purposes might be significantly hindered without appropriate gates to prevent passage of animals or trespassers. On the other hand, courts are likely to find that a gate that serves no purpose concerning the use of the burdened land is an unreasonable obstruction of an easement.[10]

The right of a servient owner to erect locked gates presents an additional issue. Generally, courts hold that a locked gate constitutes an unreasonable interference with the use of the easement, even though the dominant owner is furnished a key. A locked gate, notwithstanding the presentation of a key, curtails the dominant owner's use by restricting deliveries and social visits. . . .

Each situation, however, is governed by its particular set of facts, and courts have permitted locked gates when such gates were necessary for the servient owner to make reasonable use of the servient land.[11]

As indicated by this summary, courts have recognized that gates, especially locked gates, amount to a significant burden on a rural homeowner's right of access.[12] Every time a homeowner drives from or to his home he must stop, exit his vehicle and open the gate, get back in his vehicle, drive through, stop and exit again to close the gate, and then get back in his vehicle and drive on.[13] In the ice and darkness of an Alaska winter these multiple operations can be especially trying. Further, a gate may bar or deter guests, visitors, delivery and service providers, and emergency vehicles from reaching a home served by a roadway easement.[14]

For these reasons, gates must serve a substantial benefit to the servient land if they are to be maintained across a roadway to a home.[15] Typical examples of benefits found sufficient are to prevent livestock from straying, to prevent valuable property from being stolen or vandalized (usually in light of a history of such conduct), or to protect personal safety.[16]

Even where reasons of substance justify maintaining a gate, they may be outweighed by the inconvenience suffered by the owner of the dominant estate.[17] In cases

---

**10.** James W. Ely, Jr. and Jon W. Bruce, The Law of Easements & Licenses in Land § 8:26 (2009).

**11.** *Id.* § 8:28.

**12.** *See, e.g., Crawford v. Butler,* 924 So.2d 569, 575 (Miss.App.2005); *Van Klompenburg v. Berghold,* 126 Cal.App.4th 345, 23 Cal.Rptr.3d 799, 801 (2005).

**13.** *See, e.g., Van Klompenburg,* 23 Cal.Rptr.3d at 802 (noting difficulty in using gate).

**14.** *See, e.g., id.* (noting problems that locked gates can cause dominant owners, guests, and agents).

**15.** An example in the Restatement illustrates the need for demonstrating a tangible detriment to a servient estate before gates may be maintained across an easement that provides access to a home:

After repeated problems with vandalism, O, the owner of Blackacre, installed a locked gate at the entrance to the drive crossing Blackacre that leads from the public highway to Whiteacre. The drive is maintained pursuant to an easement appurtenant to Whiteacre. O furnished A, the owner of Whiteacre, with a key

for the gate. Whiteacre is undeveloped property that A uses infrequently for recreational purposes. In the absence of other facts or circumstances, O is entitled to maintain the locked gate because the gate is needed for the security of Blackacre, and the lessened convenience to Whiteacre is not unreasonable.

Restatement (Third) of Property: Servitudes § 4.9 illus. 4 (2000).

**16.** *See, e.g., Watson v. Banducci,* 158 Or.App. 223, 973 P.2d 395, 401–02 (1999) (gate necessary for livestock); *Ericsson v. Braukman,* 111 Or. App. 57, 824 P.2d 1174, 1178 (1992) (gate necessary where trespassers stole trees from Christmas tree farm). We have uncovered no case in which the risk of unauthorized use of a roadway easement in a rural area unaccompanied by substantial personal property or personal safety concerns has been held to justify gating a roadway easement that leads to a residence.

**17.** *See, e.g., Strahan v. Bush,* 237 Mont. 265, 773 P.2d 718, 721 (1989) (gate to prevent cattle from straying and to prevent vandalism was an unreasonable burden on residents because it presented snow removal and maintenance difficulties, one of the residents could not open the gate without

where there are reasons of substance on both sides, trial courts must weigh the benefits of a gate to the owner of the servient estate against the detriments to the owner of the dominant estate.[18] And sometimes a weighing process results in allowing gating only during periods when the need is most strongly justified.[19]

■ The record on appeal is insufficient for us to determine whether the superior court struck an appropriate balance in permitting Fagnani to maintain a closed and locked gate across the roadway easement. At oral argument Williams's counsel stated that the house served by the easement is the Williamses' regular residence. Although this was not then contradicted by Fagnani's counsel, an unverified assertion filed by Fagnani in opposition to Williams's motion for reconsideration is contradictory.[20] Likewise, absent from the record on appeal is factual support for the particular burdens said to result from the physical circumstances regarding the location of the gate and the Williamses' infirmities. Williams's assertion that no property of value on the servient estate is protected by the gate is similarly not supported by record citations. Further, the superior court made no findings concerning any of these factual allegations.

Accordingly this case must be remanded to the superior court. The court should make findings as to the facts that are relevant to the balance that must be struck to determine whether the gate constitutes an unreasonable interference with Williams's use of the roadway easement. When the court finds the relevant facts it should then determine whether the gate is an unreasonable interference in light of the facts and the principles of law expressed in this opinion.

## II. ATTORNEY'S FEES ISSUES

### A. Enhancements

■ Williams argues that the superior court erred by failing to enhance the fees it awarded him under Alaska Rule of Civil Procedure 82(b)(3). Williams requested fifty percent of all his fees ($55,855.00), including the $2,000 he paid to prior counsel. The superior court denied his request, stating that it found "no reason to order enhanced fees." Instead, it awarded him thirty percent of calculated fees under Rule 82, excluding the $2,000 Williams paid prior counsel. The final award totaled $15,333.30.

■ Rule 82(b)(2) states that the prevailing party in a case that goes to trial will receive, at a minimum, thirty percent of "reasonable actual attorney's fees which were necessarily incurred."[21] Rule 82(b)(3) gives the superior court the discretion to vary the fee award based on a consideration of various factors.[22] The court must base its decision to

---

assistance, and a cattle guard could be installed to prevent cattle from straying).

18. See, e.g., Tanaka v. Sheehan, 589 A.2d 391, 396–97 (D.C.Cir.1991).

19. Howes v. Howes, 499 So.2d 314, 317–18 (La. App.1986) (holding that locked gate between 10 p.m. and 5:30 a.m. was reasonable to prevent trespassers at night; servient owners' daughters-in-law had personal safety concerns since their husbands worked nights); Ericsson v. Braukman, 111 Or.App. 57, 824 P.2d 1174, 1178 (1992) (Servient estate, a Christmas tree farm, was permitted to maintain locked gate from November 1 to December 25 as trees were most apt to be stolen during that period.).

20. See supra page 73–74.

21. Alaska R. Civ. P. 82(b)(2).

22. Alaska R. Civ. P. 82(b)(3). The listed factors are:

(A) the complexity of the litigation;
(B) the length of trial;
(C) the reasonableness of the attorneys' hourly rates and the number of hours expended;
(D) the reasonableness of the number of attorneys used;
(E) the attorneys' efforts to minimize fees;
(F) the reasonableness of the claims and defenses pursued by each side;
(G) vexatious or bad faith conduct;
(H) the relationship between the amount of work performed and the significance of the matters at stake;
(I) the extent to which a given fee award may be so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts;
(J) the extent to which the fees incurred by the prevailing party suggest that they had been influenced by considerations apart from the case at bar, such as a desire to discourage claims by others against the prevailing party or its insurer; and
(K) other equitable factors deemed relevant.

enhance fees on one or more of the factors listed.[23] Awards made pursuant to the schedule of Civil Rule 82(b) are presumptively correct.[24] In this case, the superior court found "no reason to order enhanced fees" under Rule 82(b)(3).

Williams argues that the complexity of the litigation in this case warrants fee enhancement because the case involved factual disputes regarding a forty-year-old road and complex legal theories. Williams also argues that (1) the reasonableness of his attorney's hourly rates;[25] (2) the reasonableness of the number of attorneys he used;[26] and (3) his attorney's efforts to minimize fees[27] justify fee enhancement. Williams essentially argues that, because the superior court found Fagnani's attorney's fees to be reasonable, he should receive enhanced fees because he was charged less by his attorney. Williams also argues that "the [un]reasonableness of the claims and defenses pursued" by Fagnani and his "vexatious or bad faith conduct" warranted fee enhancement because Fagnani provided false testimony to the court during trial. His accusations are based primarily on affidavits filed with a post-trial motion that allegedly refute much of Fagnani's trial testimony. Williams finally argues that "the relationship between the amount of work performed and the significance of the matters at stake" warrant fee enhancement because "[t]he potential loss of ingress and egress for Mr. Williams' property would destroy it[ ]s value."

In response, Fagnani argues that complexity is a poor reason to justify enhancement in cases where fees are calculated on an hourly basis. Fagnani also argues that the reasonableness of the number of attorneys, hourly rates, and efforts to minimize fees are more properly used to decrease fees in cases where the prevailing party has expended an unreasonable amount of resources on the case. He argues that there was no finding of bad faith by the superior court that would warrant fee enhancement because Williams submitted the affidavits after the trial, when they were not subject to cross-examination. Finally, he argues that the significance of the matter at stake only warrants fee enhancement where the winning party litigates a case with unusual efficiency for important stakes, or the losing party does so inefficiently for insignificant issues.

■■■ Our review of the record does not show the existence of compelling reasons to overcome the presumption of correctness that is afforded to attorney's fees awards under Rule 82(b).[28] Williams presents no reason why the complexity of this case is such that it was an abuse of discretion not to award enhanced fees. The fact that Williams employed fewer attorneys who charged less per hour and minimized fees does not, by itself, warrant enhancement. Williams has already benefitted from his frugal use of legal resources because his total bill on the remaining seventy percent of fees was reduced. Furthermore, the superior court did not find that Fagnani's behavior was in bad faith or excessively litigious. The superior court is in the best position to determine such questions.[29] Finally, although this court has previously affirmed an award of enhanced fees based purely on the importance of the subject matter and not because of any efficiency in the litigation of the case,[30] whether the loss of value in Williams's land was so important as to justify enhanced fees

**23.** *See Tenala, Ltd. v. Fowler,* 993 P.2d 447, 451 (Alaska 1999).

**24.** *McGlothlin v. Municipality of Anchorage,* 991 P.2d 1273, 1277 (Alaska 1999).

**25.** Alaska R. Civ. P. 82(b)(3)(C).

**26.** Alaska R. Civ. P. 82(b)(3)(D).

**27.** Alaska R. Civ. P. 82(b)(3)(E).

**28.** We review a superior court's award of attorney's fees under the abuse of discretion standard and will disturb an award only if it is manifestly unreasonable. *Lakloey, Inc. v. Ballek,* 211 P.3d 662, 664 (Alaska 2009); *Capolicchio v. Levy,* 194 P.3d 373, 377 (Alaska 2008). If we were clearly convinced that the presumption that an award under Rule 82(b) is correct had been overcome, these standards would be satisfied.

**29.** *See, e.g., Reid v. Williams,* 964 P.2d 453, 461–62 (Alaska 1998); *Wickwire v. McFadden,* 633 P.2d 278, 281 n. 6 (Alaska 1981).

**30.** *State v. Jacob,* 214 P.3d 353, 362 (Alaska 2009) (holding enhanced fees were appropriate in part because "[t]he placement of children and the involvement of grandparents in their grandchildren's lives are not matters to be taken lightly," and thus fees were "reasonable in light of the significance of the case").

was a question committed to the discretion of the superior court.[31]

None of Williams's arguments persuade us that the superior court's refusal to award enhanced fees was an abuse of discretion.

### B. Calculations

 Williams argues that the superior court's deduction of $2,744 from his baseline fees because it was attributable to work on appeal was erroneous.[32] He argues that the superior court did not specify how it calculated the deduction; instead, the court adopted Fagnani's proposed deductions that were unsupported by the billing statements.[33]

Fagnani argues that the invoices show that there was work attributable to the appeal. However, he does not show exactly how he arrived at the $2,744.31 amount for fees incurred from December 2007 to May 2008. He identifies some specific charges for work billed in November 2007 and April 2008, but the listed charges do not add up to $2,744.31. Williams argues that the charges listed by Fagnani were for work before the superior court on remand, and not part of work done for the appeal.

Our review of the bills for December 2007 to May 2008 shows that support in the record for the deduction of the full $2,744 is doubtful. While Fagnani points out some items in the bill that arguably could be for work done on the appeal, there are several items on these bills that are most likely related to the case on remand. For instance, there are four itemized billings for work at least partially done on a "motion for attorney fees." No such motion was made on appeal. These charges total $1,054.50 [34] out of total charges of $3,350.95. Thus, even if we assume that all the other charges from December 2007 to May 2008 were attributable to the appeal, the excludable amount would only be $2,296.45.

It was an abuse of discretion to deduct $2,744 from calculated attorney's fees. On remand, the superior court should examine the relevant bills and determine which charges should be properly excluded from attorney's fees incurred in the superior court.

## III. CONCLUSION

For the reasons expressed in this opinion, the judgment of the superior court is vacated insofar as it permits appellee to maintain a closed and locked gate across the roadway easement. On remand the superior court should determine the facts relevant to the question whether the gate is an unreasonable interference with appellant's use of the easement and decide that question in light of the facts and the law. The judgment is also vacated with respect to the award of attorney's fees. On remand, based on the evidence, the superior court should determine the amount of the fees that should be deducted from appellant's baseline fees under Civil Rule 82(b). The court should then revise the award of fees in accordance with this determination. The court is authorized to conduct a supplementary evidentiary hearing as to either issue if the court believes that such a hearing will be necessary or useful.

EASTAUGH and FABE, Justices, not participating.

---

31. We note that this court has never vacated a superior court's decision refusing to enhance fees under Rule 82(b)(3). *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 45 (Alaska 1998); *see also Wasser & Winters Co. v. Ritchie Bros. Auctioneers (Am.), Inc.*, 185 P.3d 73 (Alaska 2008); *Gibson v. GEICO Gen. Ins. Co.*, 153 P.3d 312 (Alaska 2007).

32. At issue here is $823 (.3 × $2,744) in attorney's fees that Williams claims should have been awarded.

33. Williams also argues that the total attorney's fees should have included $2,000 that he paid to another attorney before retaining his current counsel. But Williams did not provide the superior court with a receipt for fees paid his first attorney. Although we will not overturn a fee award solely because it was not based on itemized statements, we have stated that trial courts should base their awards on itemized statements. *Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123, 1138 (Alaska 1989). The superior court did not abuse its discretion by failing to include the $2,000 fee when the court was not provided a receipt or statement for the charge.

34. The charges are $74.00 (billed on 2/18), $370.00 (billed on 2/23), $462.50 (billed on 3/14), and $148.00 (billed on 4/10).