*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| LUCAS BORER, | ) | |
| | ) | Supreme Court No. S-17805 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-19-10107 CI |
| v. | ) | |
| | ) | O P I N I O N |
| THE EYAK CORPORATION, | ) | |
| | ) | No.7588 – April 1, 2022 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory A. Miller, Judge.

Appearances: Lucas Borer, pro se, Cordova, Appellant. Matt Mead and Andrew Erickson, Landye Bennett Blumstein LLP, Anchorage, for Appellee.

Before: Winfree, Chief Justice, Maassen, and Borghesan, Justices. [Carney, Justice, not participating.]

BORGHESAN, Justice.

## I.   INTRODUCTION

A winning candidate for a seat on the board of directors of an Alaska Native Corporation declined to sign the corporation's confidentiality agreement and code of conduct. When the corporation denied him a seat on the board, he sought a declaratory judgment that these agreements are unlawful and an injunction that he be seated on the board. He argues that the scope of the confidentiality agreement is so

broad, and the code of conduct so apt to be used to suppress dissenting directors, that they are inconsistent with directors' fiduciary duties to the corporation. Because he does not challenge the application of these agreements to any concrete factual situations, we conclude that his claims are not ripe for adjudication. We therefore affirm the judgment and the award of attorney's fees against him.

## II.   FACTS AND PROCEEDINGS

### A.   Facts

The Eyak Corporation is the Alaska Native Village Corporation for Cordova, formed pursuant to the Alaska Native Claims Settlement Act.[1] Eyak's board is made up of nine members who serve staggered three-year terms; each year, three directors are up for election. Eyak's bylaws require several qualifications to serve on the board. Only one qualification is in dispute here: "Any person who is elected or selected to be a Director shall be seated as a Director only after he or she executes an acknowledgment agreeing to comply with the Corporation's code of conduct and executes the Corporation's confidentiality agreement." The requirement to execute these two documents (collectively referred to as the Agreements) has been in place since 2012.

Lucas Borer previously served on the Eyak board from 1985-1989 and ran for the board again unsuccessfully in 2012, 2015, 2017, and 2018. In 2015 Borer corresponded with the chair of Eyak's board of directors, criticizing Eyak's bylaws and the Agreements. Eyak declined to amend its governing documents at that time.

Borer ran again in 2019. At the top of the candidate application form, the qualifications for directors were clearly stated. Borer signed the form, right below a statement that read: "I understand that the information set forth above will be relied

---

[1]   *See generally* 43 U.S.C. § 1607.

upon by The Eyak Corporation in the preparation of its election materials for the upcoming Annual Meeting of Shareholders."

Borer received enough votes in the election to win one of the three available seats on the board. At a board meeting following the election Borer and the two other winning candidates were asked to execute the Agreements before they were seated. Borer asked for more time to review the Agreements with his counsel before he signed them. Because Borer did not execute the Agreements at the meeting, Eyak did not allow him to be seated as a director at that time.

The chair of Eyak's board of directors sent Borer a letter congratulating him on his election, attaching the Agreements, and advising him that he must execute the Agreements to qualify to be seated as a director under the bylaws. The chair emphasized that the board wanted "to make sure the shareholders who voted for [Borer] are not disenfranchised while timely-seating elected directors and avoiding vacant seats on the Board." The chair requested that Borer execute the Agreements by May 28, 2019, or else Eyak would "proceed to fill the vacancy."

Four days before the execution deadline, Borer responded with a letter addressed to the board. Borer claimed that he had been pressured to sign the Agreements and that, "[h]aving seen . . . a similar document in the past, [he] suspected that this one would similarly attempt to take away or reduce [his] rights as a board member."

Borer then outlined numerous issues with the Agreements that he claimed would result in breach of fiduciary duty and violation of Alaska law — including many that are now the basis for his appeal. Borer stated that although he "completely underst[ood] the need for a *reasonable* Code of Conduct" he claimed that the Agreements "*effectively prohibit any communication* between a director and a

shareholder."[2] He maintained that he was not required to sign the Agreements to qualify for the board, asserting that he had "legitimate and legal reasons for not signing the [Agreements]" and that executing the Agreements "would represent an abdication of [his] responsibilities as a director."

Eyak responded in a June 27 letter to Borer stating that it had revised the Agreements in response to his concerns. Eyak gave Borer a new deadline of July 11 to execute the revised Agreements and again notified him that if he failed to do so, the board would give his seat to someone else.

Borer did not sign the Agreements prior to the July 11 deadline; it appears that he never responded at all. On July 17 Eyak notified Borer that it had seated another eligible candidate as director to fill the vacancy.

Borer's attorney sent a letter to Eyak demanding that Borer be seated on the board. The letter stated that "[i]nviting shareholders to vote for an ineligible candidate is a misleading proxy solicitation" and reiterated many of Borer's concerns from his earlier letter to the board. He also proposed further revisions to the Agreements.

Eyak refused Borer's demand. Citing its bylaws, Eyak stated that it had "been clear with its shareholders and Mr. Borer at every step of the nominations and election process that only eligible candidates who execute [the Agreements] will be qualified to be seated as directors."

## B. Proceedings

Borer filed a complaint for declaratory and injunctive relief in the superior court. Borer sought "a declaratory judgment stating he remains a duly elected [Eyak] director and an injunction requiring [Eyak] to seat him on its board." He claimed that he was validly elected and that signing the Agreements "would reduce or eliminate his

---

[2]     The italics appear in the original document.

ability to exercise his fiduciary duty to the corporation." Borer also took issue with various enforcement provisions of the Agreements, including provisions that he claimed would "eliminate the director's ability to participate in board meetings and eliminate the director's statutory right to inspect corporate information." Borer also filed a motion for preliminary injunction directing that Eyak seat him as director. In that motion, Borer stated "he had just been handed [the Agreements] th[e] morning" of the board election.

Eyak opposed the motion for preliminary injunction and disputed Borer's characterization of the facts. Eyak argued that Borer had "full knowledge of the Code of Conduct and Confidentiality Agreement's provisions and purpose," pointing to several pieces of evidence: a newsletter issued to shareholders describing Eyak's director confidentiality agreement; Borer's previous campaigns for the director seat; correspondence between Borer and the chair of the board regarding the Agreements in 2015; and the fact that Borer had "affirmatively represented his agreement to be bound by those documents in the event he was elected when he signed and returned the 2019 Candidate Application Form."

The superior court denied Borer's motion for preliminary injunction. The court first noted that "[w]hen this court read Mr. Borer's opening motion, this court was left with the impression that Mr. Borer had no prior notice of the Code of Conduct, that the document was essentially thrust upon him minutes before the vote, and that the document may even have been drafted or at least revised specifically to limit him if he won," but that Eyak's opposition and attached exhibits "ma[de] clear that that was not the case." The court ruled that Borer had not met his legal burden of demonstrating either a "clear showing of probable success on the merits" or "substantial questions going to the merits of the case." It found that "Borer [had] not shown that he will suffer irreparable harm, or that [Eyak] won't." It also found that Eyak could be irreparably harmed if Borer were seated without signing the code of conduct because the code

"insures against a director improperly disclosing . . . confidential corporate business opportunities." Borer moved for reconsideration, which the superior court denied.

Eyak then moved for summary judgment, arguing that Borer was not qualified to be seated as a director due to his failure to sign the Agreements and that its code of conduct and confidentiality agreement do not violate Alaska law. Eyak argued that Borer "asks for the extraordinary: invalidation of a corporation's bylaws based on a series of hypothetical events and the removal of a qualified, sitting director to seat an unqualified director."

The superior court heard oral argument and subsequently granted summary judgment to Eyak in a decision on the record. The court stated without elaboration that "[e]verything is ripe" for adjudication. The court then determined that "[t]here are no disputed material facts," observing that Borer had refused to sign Eyak's Agreements despite agreeing to do so on the candidate application form and that signing the Agreements was a requirement to become an Eyak director. The court also determined, pointing generally to "Alaska statutes that permit [corporate] bylaws to define . . . codes of conduct[] and board governance," that Eyak's requirement to sign the Agreements was "a requirement that squares with the law." The court also indicated that it viewed Borer's challenges as merely hypothetical, referring to decisions of Delaware courts that declined to strike down corporate bylaws based on "hypothetical risk of harm."[3]

Eyak moved for 20% of its attorney's fees under Alaska Civil Rule 82(b)(2), which the court granted. Borer appeals the grant of summary judgment, the denial of his motions for summary judgment and preliminary injunction, and the award of attorney's fees.

---

[3]     *E.g.*, *Stroud v. Grace*, 606 A.2d 75, 96 (Del. 1992).

## III. STANDARD OF REVIEW

We review a grant of summary judgment de novo.[4] Whether an issue is ripe for adjudication is a legal determination that we consider de novo.[5] We review an award of attorney's fees for abuse of discretion[6] and will reverse "only if the award is 'arbitrary, capricious, manifestly unreasonable, or stems from improper motive.' "[7]

## IV. DISCUSSION

### A. Borer's Challenge To The Corporation's Code Of Conduct And Confidentiality Agreement Is Not Ripe For Adjudication.

Borer's claim that he was validly elected as a director hinges upon his view that the Agreements are unlawful. Eyak's bylaws required Borer to sign the Agreements in order to be seated as a director,[8] and when Borer refused to do so, Eyak in turn refused to seat Borer. Borer argues that because the Agreements are unlawful, the bylaws'

---

[4] *Parker v. Tomera*, 89 P.3d 761, 765 (Alaska 2004).

[5] *State v. ACLU of Alaska*, 204 P.3d 364, 368 (Alaska 2009).

[6] *Nichols v. State Farm Fire & Cas. Co.*, 6 P.3d 300, 303 (Alaska 2000).

[7] *Id.* (quoting *Jones v. Jones*, 925 P.2d 1339, 1340 (Alaska 1996)).

[8] Eyak's bylaws mandate: "Any person who is elected or selected to be a Director shall be seated as a Director only after he or she executes an acknowledgment agreeing to comply with the Corporation's code of conduct and executes the Corporation's confidentiality agreement."

requirement that he sign them cannot lawfully be enforced,[9] so Eyak had no valid grounds to refuse to seat Borer as director.[10]

A threshold issue in this case is which versions of the Agreements are relevant in this dispute: the versions in effect when Borer was initially elected in May 2019, or the versions that Eyak revised in June 2019 in response to Borer's concerns. Borer argues that the earlier versions of the Agreements are relevant because they were in effect when his qualifications as a director were being determined at the May 2019 board meeting. That is not correct. The board revised the agreements in light of Borer's concerns and then gave him an opportunity to be seated as a director if he signed them. In other words, Eyak determined Borer was not eligible because he did not sign the *revised* agreements. We therefore consider the revised Agreements in our analysis.

Borer's argument in a nutshell is that were he to sign the Agreements as a condition of being a director of the board, the Agreements would impermissibly burden his ability to fulfill his fiduciary duties to the corporation. Under Alaska law a director has a fiduciary duty to act in good faith, to act in a manner he or she reasonably believes to be in the best interests of the corporation, and to act with care.[11] Borer identifies six

---

[9] A corporation's internal governance rules must not be contrary to law. AS 10.06.230(e) ("The bylaws may contain any provision, not in conflict with law or the articles of incorporation, for the management of the business of the corporation and for the conduct of the affairs of the corporation, including . . . the qualifications . . . of directors.").

[10] Except for the limited means prescribed by the corporations code, "a director may not be removed before the expiration of the term of office of the director." AS 10.06.460(b). Eyak's bylaws also specify that "[n]o director may be removed from office before the expiration of his term except as provided [in the bylaws]," which prescribe limited procedures for removal.

[11] AS 10.06.450(b); *Holmes v. Wolf*, 243 P.3d 584, 598-99 (Alaska 2010)
(continued...)

aspects of the Agreements he was required to sign that, in his view, would preclude him from fulfilling those duties:

> (1) the lack of reporting procedures for illegal activity;
>
> (2) the failure to provide for an impartial disciplinary tribunal;
>
> (3) the scope of the confidentiality agreement;
>
> (4) the requirement to acknowledge that the Board acts "as a group and not individuals";
>
> (5) the sanction of withholding travel funds; and
>
> (6) the sanction of restricting a director's access to confidential information.

The first two problems can be addressed summarily. Borer's argument that the confidentiality agreement makes no exception for reporting illegal activity is based on the prior version of the agreement that is no longer in effect. In response to Borer's concerns, Eyak added language clarifying that its confidentiality code does not "limit [a director's] duty to report a violation of law." As explained above, it is the updated version of the Agreements we are reviewing on appeal. Therefore this particular critique is moot, and we decline to address it.[12]

Borer's second argument is that the corporation's disciplinary process for board members does not provide an impartial tribunal and therefore violates the Due

---

[11]     (...continued)
(citing AS 10.06.450(b) and describing director's statutorily prescribed duties as "fiduciary dut[ies]"); *accord* 3A FLETCHER CYC. CORP. § 837.50 (2021) ("[A] director or officer of a corporation owes the corporation complete loyalty, honesty, and good faith.").

[12]     *Ahtna Tene Nené v. State, Dep't of Fish & Game*, 288 P.3d 452, 457 (Alaska 2012) (explaining that we refrain from deciding moot questions, particularly where declaratory relief is sought).

Process Clause of the Fourteenth Amendment. But Borer waived this argument[13] by failing to raise it before the superior court.[14]

The remainder of Borer's challenges are not ripe for adjudication.[15] Borer asks this court to strike down a corporation's internal governance rules even though those rules have not yet been applied to him in a concrete factual scenario. Eyak, citing Delaware law, argues that Borer cannot challenge corporate internal rules based on hypothetical abuses. Although Eyak is correct that Delaware courts "typically decline to decide issues . . . that create hypothetical harm,"[16] we see no need to adopt Delaware

---

[13]     *McMullen v. Bell*, 128 P.3d 186, 190 (Alaska 2006) ("Ordinarily 'this court will not consider an issue raised for the first time on appeal.' " (quoting *State v. Nw. Constr., Inc.*, 741 P.2d 235, 239 (Alaska 1987))). Borer argues that Eyak first raised the due process issue before the superior court, but this is not quite accurate. Eyak did mention "due process" in its opposition to Borer's motion for preliminary injunction, but it did so as an analogy to support the validity of its discretionary sanction procedures — not to raise due process as a separate issue.

[14]     In any event Eyak is a private corporation, not a governmental entity, and therefore is not bound by the requirements of due process. *See Anderson v. Alaska Hous. Fin. Corp.*, 462 P.3d 19, 26 (Alaska 2020) (explaining that due process clause applies only to governmental actors, including government-controlled corporations). Although Borer emphasizes that Eyak receives over 90% of its revenue from the government, Eyak's board is elected by its shareholders — not the government. Borer thus cannot claim that Eyak is a government-controlled corporation subject to the due process clause. *Id.* at 26 (holding that corporation was "wholly controlled by the [s]tate" because "[a]ll seven members of [corporation's] board [we]re government officials or appointed by the governor").

[15]     The superior court concluded without analysis that "[e]verything is ripe." But because whether a claim is ripe for adjudication is a question of law, we review this issue de novo. *State v. ACLU of Alaska*, 204 P.3d 364, 368 (Alaska 2009).

[16]     *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 940 (Del. Ch. 2013) (quoting 3 STEPHEN A. RADIN, THE BUSINESS JUDGMENT RULE: FIDUCIARY
(continued...)

rules here. Our ripeness doctrine aptly deals with the question of whether it is appropriate to render declaratory judgment based on hypothetical applications of the challenged law.

Alaska's declaratory judgment act requires there be an "actual controversy" for a court to issue declaratory relief.[17] This requirement "reflects a general constraint on the power of courts to resolve cases,"[18] cautioning that courts should not "resolve abstract questions of law."[19] Ripeness is an element of the "actual controversy" requirement.[20]

A ripe suit will present "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[21] The primary concern of ripeness is "whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all."[22] The doctrine of ripeness thus "requires a plaintiff to claim that either

---

[16]     (...continued)
DUTIES OF CORPORATE OFFICERS 3498 (6th ed. 2009)).

[17]     *ACLU of Alaska*, 204 P.3d at 368.

[18]     *Id.*

[19]     *Id.* at 369 (quoting *Bowers Office Prods., Inc. v. Univ. of Alaska*, 755 P.2d 1095, 1097-98 (Alaska 1988)).

[20]     *Id.* at 368. Mootness and standing are the other elements of the "actual controversy" requirement. *Id.*

[21]     *Id.* at 369 (quoting *Brause v. State, Dep't of Health & Soc. Servs.*, 21 P.3d 357, 359 (Alaska 2001)).

[22]     *Brause*, 21 P.3d at 359 (quoting 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3532, at 112 (2d ed. 1984)).

a legal injury has been suffered or that one will be suffered in the future."[23] There is no "set formula" for determining ripeness.[24] Instead, we balance "the fitness of the issues for judicial decision" with "the hardship to the parties of withholding court consideration."[25] As a part of this balancing test, we consider whether "concrete factual scenarios" would assist in bringing about the "ultimate resolution of the issue before us."[26]

In *State v. ACLU of Alaska* the plaintiffs brought a pre-enforcement suit challenging the constitutionality of a state statute prohibiting marijuana possession.[27] We held that the challenge was unripe.[28] We assessed hardship, which we determined was "slight" because the sole hardship alleged — the risk of criminal liability for marijuana possession — already existed under federal law prohibiting marijuana possession.[29] We assessed fitness for decision, emphasizing that our analysis about the statute's constitutionality "could be aided by one or more concrete factual scenarios."[30] We discussed the possibility of "cases where . . . the statute could permissibly be applied" without constitutional problem, reasoning that adjudication of "an actual case, or several

---

[23]    *Id.*

[24]    *Id.*

[25]    *ACLU of Alaska*, 204 P.3d at 369 (quoting *Brause*, 21 P.3d at 359).

[26]    *Id.* at 373.

[27]    *Id.* at 366.

[28]    *Id.* at 373-74.

[29]    *Id.* at 369-71, 374.

[30]    *Id.*

actual cases" could cast the issues presented "in a different light."[31] We concluded that given the potential for concrete facts to aid the decision and the limited hardship to the parties of withholding a decision, the case was not ripe for adjudication.[32]

In this case, too, the risks of making a decision without concrete facts outweigh the harm of withholding a decision. There is no doubt that Borer will suffer some hardship if we decline to adjudicate his claims: he will lose his legal claim to a directorship on Eyak's board and the incumbent rights and duties that he would gain as a director. Yet it is worth noting that Borer has contributed to this hardship himself by rejecting the Agreements out of hand without waiting to see whether they would actually place him in a position of being unable to fulfill his fiduciary duties. And this hardship for Borer must be weighed against the fitness of his claims for adjudication.

Because Borer does not allege any concrete factual scenarios where the Agreements are being applied, he fails to show precisely how, and to what degree, the Agreements are in tension with a director's fiduciary duties. Although it is certainly possible to imagine overbroad or abusive applications of these Agreements, his "pre-enforcement" challenge leaves us uncertain whether the Agreements would actually be used in those ways. Indeed, there is far greater uncertainty about how the relatively general terms of these Agreements would be applied to specific factual scenarios than there was when we concluded that a pre-enforcement challenge to laws prohibiting marijuana possession was unripe.[33] Borer's claims require us to decide whether Eyak's Agreements are in irreconcilable tension with a director's fiduciary duties. As explained

---

[31]     *Id.* at 372.

[32]     *Id.* at 373-74.

[33]     *Id.*

in detail below, we cannot confidently answer that question without seeing how the challenged terms of these agreements are applied to real-world situations.

### 1. Scope of the confidentiality agreement

Borer argues that Eyak's confidentiality agreement is overbroad. The agreement states, in relevant part:

> 1. I understand and acknowledge that as a director of the Corporation, I will review and consider a variety of confidential and sensitive information. "Confidential Information" may include any number of different forms, and includes, but is not limited to business, operation, finance, strategic, personnel, litigation, executive session, and other proprietary information of The Eyak Corporation and its subsidiaries and affiliates. . . . Confidential Information does not include information that has been made public by the Corporation. I agree that if I am unsure whether information is confidential, I will treat it as confidential.
>
> . . . .
>
> 3. I will keep all Confidential Information private and confidential, and will use my best efforts to prevent inadvertent or unauthorized disclosure. I will not, without prior written consent of the Corporation, disclose Confidential Information to anyone. I will only use Confidential Information in furtherance of my duties as a Director.

Borer claims that the expansive definition of "confidential information" in the agreement would render "literally anything" confidential, so that signing the agreement could prevent him from discussing even innocuous matters like "the outlook for the coming fiscal year" with shareholders. He argues that this will prevent him from representing and advocating for shareholders on the board.

At the outset we observe that a board of directors has a duty of "complete candor to its shareholders to disclose all germane or material information," and this duty

"applies to matters of corporate governance as well as to corporate transactions."[34] We presume Eyak's board is aware of this general fiduciary duty and that the confidentiality agreement will be construed and applied in light of this duty.

Borer's argument relies on *Pederson v. Arctic Slope Regional Corp.*, in which we determined that a corporate confidentiality agreement was "unreasonably broad" as applied to a shareholder's request for corporate documents.[35] When the shareholder refused to sign a confidentiality agreement, the corporation withheld requested documents from the shareholder.[36] We recognized a confidentiality agreement may be appropriate if it "reasonably defines the scope of what is confidential information subject to the agreement" and has provisions "that are not unreasonably restrictive in light of the shareholder's proper purpose and the corporation's legitimate confidentiality concerns."[37] Applying those standards to the specific documents requested by the shareholder, we concluded that the confidentiality provisions were "unreasonably restrictive, at least as they related to executive compensation and stock interests" especially taking into account the burden these restrictions placed on the shareholder's purpose of "making use of disclosed information to organize his fellow shareholders to restrict" certain types of transactions by the corporation's executives.[38]

---

[34]     3A FLETCHER CYC. CORP. § 837.70 (2021).

[35]     331 P.3d 384, 403 (Alaska 2014). Under Alaska law, a corporation "shall make its books and records of account . . . reasonably available for inspection . . . by a shareholder of the corporation."  AS 10.06.430(b).

[36]     *Pederson*, 331 P.3d at 388-90.

[37]     *Id.* at 402.

[38]     *Id.* at 403.

*Pederson* is distinguishable because we could determine in that case whether the confidentiality provisions were reasonable as applied to specific information sought for a particular purpose. We do not have those concrete facts here. Instead we have a range of information that might be deemed confidential. According to the confidentiality agreement, confidential information "may include" information from various categories such as "business, operation, finance, strategic, personnel, litigation, executive session, and other proprietary information," but the agreement does not suggest that all information within these categories will be deemed confidential. Each category covers a wide range of information, and the justification for treating particular types of information within each category will vary significantly. For example, the category of "litigation" information includes attorney-client confidences as well as information stated in documents filed in court. It is unquestionably proper to treat the former type of information as confidential, and unquestionably improper to treat the latter as confidential (as court-filed documents have already been publicly disclosed). Because we are not presented with a situation in which Eyak has deemed specific pieces of information confidential, it is difficult to assess the justification for that label, or how treating that information as confidential affects a director's exercise of fiduciary duties.

This difficulty is compounded by the fact that a director's fiduciary duties are themselves general maxims: to act in good faith, for the best interests of the corporation, and with due care.[39] Determining a director's adherence to these duties is a highly fact-specific inquiry.[40] Accordingly, whether having to keep information confidential is compatible with a director's fiduciary duties depends not only on what

---

[39] AS 10.06.450(b).

[40] *See* 3A FLETCHER CYC. CORP. § 837.50 (2021) ("Generally, any alleged breach of a fiduciary duty is a question for the trier of fact after examination of all the evidence.").

information is at issue, but also the specific factual circumstances that arguably require the director to disclose this information. Trying to decide whether the confidentiality agreement is compatible with a director's fiduciary duties when we do not know what information has been deemed confidential and why the director believes it should be disclosed would substantially elevate the risk of an erroneous decision. For that reason, the question whether Eyak's confidentiality agreement may in some instances be inconsistent with a director's fiduciary duties to the corporation is not ripe for adjudication.

### 2. Director's duty to acknowledge that director "shall not undermine public or shareholder confidence in the board"

Borer challenges a provision in the code of conduct that requires directors to acknowledge that the Board acts "as a group and not individuals." The relevant language reads:

> [E]ach director shall: . . . acknowledge that the Board acts as a group and not individuals, and once the Board has acted, a director may seek change through Board action, but shall not undermine public or shareholder confidence in the Board or the Corporation.

Borer argues that the requirement is unlawfully restrictive because it would prohibit directors from publicly expressing dissent to shareholders, in contravention of directors' fiduciary duties.

Without concrete facts, it is difficult to assess the degree of tension between the somewhat vague rule that a director may not "undermine public or shareholder confidence" in the board or corporation and the scope of a director's fiduciary duties when the director disagrees with the action being taken. Under Alaska law a director has a fiduciary duty to act in good faith, to act in a manner the director reasonably believes

to be in the best interests of the corporation, and to act with care.[41] Alaska law also recognizes a director's "right to dissent" from corporate action, which may be recorded in the minutes of a board meeting or filed in writing immediately after the meeting.[42] But there is ample room for a director to register dissent from corporate action without undermining confidence in the board. No facts in the record suggest that this proviso would be used to "muzzle [the] minority" as Borer, quoting a Delaware case, asserts.[43] And we can envision circumstances in which enforcing this provision might be justified. The Delaware case Borer quotes provides one example: acting on one's disagreement with a particular corporate action by trying to persuade investors to abandon the corporation would seem contrary to a directory's duty of loyalty to the corporation.[44] In these circumstances, the corporation might be justified in finding that the director has violated this proviso and sanctioning the director accordingly. We decline to adjudicate the lawfulness of this proviso absent its application to concrete facts that can help us accurately resolve whether it is inconsistent with a director's fiduciary duties to the corporation.

---

[41]  AS 10.06.450(b).

[42]  AS 10.06.450(e).

[43]  *Shocking Techs., Inc. v. Michael*, No. 7164-VCN, 2012 WL 4482838, at *11 (Del. Ch. Oct. 1, 2012), *vacated on other grounds*, *Shocking Techs., Inc. v. Michael*, No. 7164-VCN, 2015 WL 3455210 (Del. Ch. May 29, 2015).

[44]  *See id.* at *1, *9-11 (holding that director who had disclosed company's confidential information to "dissuade the only remaining potential investor from investing in the [c]ompany" in order to further the director's personal goals had breached duty of loyalty).

### 3. Board's authority to sanction director by withholding travel expenses

A director has a fiduciary duty of care,[45] and habitual failure to attend board meetings may violate that duty.[46] Invoking this duty, Borer challenges two provisions in Eyak's code of conduct that authorize withholding a director's compensation and travel expenses if the director violates the code:

> [A] director who is found through the [disciplinary] procedure to have violated the provisions of this Code of Conduct shall be subject to any or all of the following sanctions: . . . cessation of eligibility to receive all other forms of compensation including travel expenses.
>
> . . .
>
> [A] director who fails to (1) comply with all disclosure requirements . . . , (2) execute an acknowledgment agreeing to comply with this Code of Conduct, (3) execute the Corporation's Confidentiality Agreement, or (4) swear an oath of allegiance to the Corporation . . . , shall be ineligible to receive meeting fees, and other forms of compensation, including travel expenses. Once the director's failure has been rectified, he or she shall become eligible to receive all forms of compensation to which he or she is otherwise entitled as a director.

Borer argues that withholding travel reimbursement is an unlawful sanction because it would cause the sanctioned director to miss board meetings and therefore violate the director's fiduciary duty.

---

[45]     AS 10.06.450(b).

[46]     3A FLETCHER CYC. CORP. § 1049 (2021) ("Mere failure of a director to attend a meeting of the board is not necessarily an actionable breach of the director's duty of care . . . [but] a director habitually missing meetings may be a basis for breach of the duty of care.")

The only fact that Borer has alleged to support this challenge involves a former director who told Borer he was "denied travel to board meetings and had to attend telephonically because of a dispute over his compliance with the code of conduct." The fact of telephonic participation itself does not establish that the director's ability to participate in board meetings was meaningfully hindered. Although Borer asserts in conclusory fashion that having to attend a meeting telephonically or virtually puts sanctioned directors at a disadvantage by reducing opportunities for participation, that is not an inevitable result of remote participation. And even if remote participation is somewhat less effective or unwieldy, it does not follow that these minor disadvantages result in a violation of the director's duty of care.[47] Absent concrete facts that illustrate precisely how remote participation in a meeting of the board of directors might impair a director's fiduciary duty, we decline to adjudicate the lawfulness of withholding travel expenses as a sanction for noncompliance with the corporation's rules for directors.

### 4. Board's authority to sanction director by barring access to corporate information

Borer challenges a provision in the code of conduct that permits the board to sanction directors by barring them from reviewing any proprietary or confidential information. The relevant provision reads:

> [A] director who breaches the Confidentiality Agreement . . .
> (demonstrated by a 2/3 vote of the remaining directors) shall
> not be entitled to review any proprietary or confidential

---

[47] Borer hypothesizes certain scenarios, like a telephone or internet outage, that would result in a director attempting to participate remotely being unable to attend the meeting at all. But the possibility of logistical problems is always present, even if the corporation is paying a director's travel expenses. A director might miss the meeting because bad weather prevents the plane from flying. We do not think a director in this situation has failed to uphold fiduciary duties to the corporation.

> information unless and until the Board determines the breach
> has been rectified.

Borer argues that this sanction would violate directors' statutorily protected "absolute right" to inspect corporate documents.[48]

Although we have not addressed whether this right is truly "absolute,"[49] Borer himself suggests that it is not. He argues that access to information may be restricted in some circumstances, such as when a director has "clear intent to use the documents to commit an egregious tort" against the corporation. His position is consistent with case law interpreting California's virtually identical statute.[50] California

---

[48]    AS 10.06.450(d) provides directors with an "absolute right" to "inspect and copy all books, records, and documents . . . of the corporation."

[49]    We have addressed various aspects of the director inspection statute, but not this precise question. *See, e.g.*, *Henrichs v. Chugach Alaska Corp.*, 260 P.3d 1036, 1041 (Alaska 2011) (concluding that while directors were permitted to "inspect and copy" records there was no attendant right for the corporation to "actively deliver the shareholder records to directors or shareholders who request them"); *Rude v. Cook Inlet Region, Inc.*, 294 P.3d 76, 93 (Alaska 2012) (rejecting as moot a former director's claim of absolute entitlement to inspect "information related to the management of the corporation" because he was no longer a director).

[50]    Alaska's director inspection statute is essentially identical to California's, which differs from the current Model Business Corporation Act and the statutes of most other states. *Compare* AS 10.06.450 ("A director has the absolute right at a reasonable time to inspect and copy all books, records, and documents . . . of the corporation."), *and* Cal. Corp. Code § 1602 (1975) ("Every director shall have the absolute right at any reasonable time to inspect and copy all books, records and documents . . . of the corporation of which such person is a director . . . ."), *with* MODEL BUS. CORP. ACT § 16.05 (AM. BAR ASS'N 2016) ("A director of a corporation is entitled to inspect and copy the books, records and documents of the corporation at any reasonable time to the extent reasonably related to the performance of the director's duties as a director . . . ."), *and* Del. Code Ann. tit. 8, § 220(d) (2010) ("Any director shall have the right to examine the corporation's stock ledger, a list of its stockholders and its other books and records

(continued...)

courts have construed a director's statutory "absolute" right to inspect corporate records to contain certain limitations.[51] California courts have held that "[t]o be entitled to inspect corporate records, directors must remain disinterested and independent in the performance of their fiduciary duties."[52] Therefore "[t]he absolute right . . . is subject to exceptions and may be denied where a disgruntled director announces his or her intention to violate his or her fiduciary duties to the corporation, such as using inspection rights to learn trade secrets to compete with the corporation."[53]

We decline to decide in a factual vacuum whether Alaska's similar statute contains similar exceptions and whether this proviso of Eyak's code of conduct is consistent with any such exceptions. In *ACLU of Alaska* we reasoned that the law prohibiting possession of marijuana might be subject to a "narrowing construction" that would "uphold[] the statute in cases directly involving the health and safety goals on which the statute is based."[54] In answering the question of how the statute should be construed, we concluded that "[a]llowing the normal processes of adjudication to take place may be of assistance."[55] The same is true here, when determining whether this corporate proviso may be lawful requires us to first construe the scope of the statutory

---

[50]     (...continued)
for a purpose reasonably related to the director's position as a director.").

[51]     9 WITKIN, SUMMARY OF CALIFORNIA LAW § 94 (11th ed. 2021) (in California a director's "absolute right to inspect does not mean unlimited access").

[52]     *Wolf v. CDS Devco*, 110 Cal. Rptr. 3d 850, 862 (2010).

[53]     *Tritek Telecom, Inc. v. Superior Ct.*, 87 Cal. Rptr. 3d 455, 459 (2009).

[54]     204 P.3d 364, 373 (Alaska 2009).

[55]     *Id.*

right to inspection. Attempting to define those contours "in the absence of actual facts" would elevate the risk of erroneous decision.[56]

And as was true of the arguments in favor of deciding a preenforcement challenge in *ACLU of Alaska*, Borer's fear that this proviso will be applied to him "may be speculative and overstated."[57] Borer offers little reason to think that his concern is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[58] Borer has submitted the affidavit of Jason Barnes, who served as a director from 2010 - 2013. Barnes stated that his efforts to obtain corporate records to "substantiate the annually reported financial figures of [Eyak] subsidiaries" was improperly denied by the Board's chairman under the guise of a breach-of-confidentiality sanction. Barnes's affidavit, taken as true, indicates that the chairman abused the sanction to hinder Barnes's performance of fiduciary duties.[59] But the assertion of one instance of abuse almost a decade ago gives little support for us to conclude that there is substantial risk that two-thirds of the Eyak Board will vote, under false pretenses, to deny other directors' statutory right to inspect corporate documents.

In sum, Borer's challenges to Eyak's corporate governance documents are not ripe for decision. Absent concrete facts, it is uncertain how they will be applied and whether these hypothetical applications would be unlawful. Borer's position is, in effect,

---

[56] *Id*.; *see also Sands ex rel. Sands v. Green*, 156 P.3d 1130, 1134 (Alaska 2007) ("[I]t is not surprising that a concrete case involving a concrete factual scenario has uncovered a previously unanswered question.").

[57] 204 P.3d at 371.

[58] *Id*. at 369 (quoting *Brause v. State, Dep't of Health & Soc. Servs.*, 21 P.3d 357, 359 (Alaska 2001)).

[59] Barnes's affidavit suggests that he and other board members believed there was no "breach" of confidentiality to properly trigger the sanction.

that any person elected to be a director of a corporation may obtain a declaratory judgment that particular corporate governance rules are invalid because they might be abused in specific factual situations that have not occurred yet and may not occur at all. The ripeness doctrine cautions against precisely this approach because deciding cases in a factual vacuum creates risks of erroneous decisions and devotes judicial resources to problems that may never materialize.[60]  We therefore decline Borer's invitation to adjudicate these claims and affirm the superior court's judgment for Eyak.[61]

**B.      It Was Not An Abuse Of Discretion To Award Eyak 20% Of Its Attorney's Fees Under Civil Rule 82.**

The superior court deemed Eyak the prevailing party and awarded it 20% of its attorney's fees, totaling $17,780.  Borer appeals this decision.  He does not challenge the superior court's prevailing party designation, but instead challenges the decision to award fees and the amount awarded.

A trial court has "broad discretion to award fees and to alter the amount it intends to award."[62]  When "the prevailing party recovers no money judgment," Alaska Civil Rule 82(b)(2) instructs courts to "award the prevailing party in a case resolved without trial 20 percent of its actual attorney's fees which were necessarily incurred."

---

[60]     *Brause*, 21 P.3d at 359-60.

[61]     Because we affirm the grant of summary judgment to Eyak, Borer's preliminary injunction argument — that the superior court erred in denying his request to require Eyak to seat him as a director — is moot.  *See Roach v. First Nat'l. Bank of Anchorage*, 643 P.2d 690, 690-91 (Alaska 1982) (agreeing preliminary injunction should be dissolved after underlying claims dismissed).

[62]     *Boiko v. Kapolchok*, 426 P.3d 868, 876 (Alaska 2018) (quoting *Cizek v. Concerned Citizens of Eagle River Valley, Inc.*, 71 P.3d 845, 851 (Alaska 2003)).

Any award made pursuant to Rule 82 is "presumptively correct"[63] but "may be set aside for 'compelling reasons.' "[64]

None of the reasons Borer offers for why the court should have reduced or eliminated the fee award is compelling. First, Borer claims that Eyak's attorney "expressly threatened Borer regarding the fee award prior to this litigation." But the only evidence in the record of a "threat" is the attorney's letter notifying Borer that Eyak would not seat him as director. The letter alludes to the possibility of an adverse fee award, stating that Eyak was "confident that a court will not view Mr. Borer as a 'public interest litigant.' " This statement was not improper: advising the opposing party of a financial cost of litigation, without more, is not some improper tactic warranting a reduction in attorney's fees.[65]

Second, Borer appears to invoke Alaska Civil Rule 82(b)(3)'s subsection (I), which allows trial courts to consider "the extent to which a given fee award may be so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts."[66] Borer challenges the fee award because "[Alaska] Natives are an economically disadvantaged group and a large fee award would seriously

---

[63]     *Dickson v. State, Dep't of Nat. Res.*, 433 P.3d 1075, 1089 (Alaska 2018) ("[A]wards of attorney's fees made pursuant to the schedule set out in Rule 82 are presumptively correct, and the superior court need not make any findings in support of the award." (alteration in original) (quoting *Greene v. Tinker*, 332 P.3d 21, 41 (Alaska 2014))).

[64]     *Id.* (quoting *Williams v. Fagnani*, 228 P.3d 71, 77 (Alaska 2010)).

[65]     *See* Alaska R. Prof. Conduct 4.1(a) (prohibiting only "false statement[s] of material fact or law to a third person").

[66]     Alaska R. Civ. P. 82(b)(3)(I).

discourage similarly situated litigants"[67] and because "[f]ew, if any individual shareholders have the means or will to challenge the board." We are not persuaded that the 20% fee award here, totaling $17,780, was "so onerous" that it would deter similarly situated litigants from bringing meritorious claims against a corporation.

Third, Borer invokes subsection (H), which allows trial courts to consider "the relationship between the amount of work performed and the significance of the matters at stake."[68] Borer essentially claims that Eyak's litigation costs were disproportionately high given the low stakes for Eyak in this case, indicating that Eyak prolonged litigation because of "motivation beyond the case at hand." But Borer downplays what was at stake for Eyak in this case. Had Borer prevailed, Eyak's ability to protect its interests through the confidentiality agreement and code of conduct for directors might have been impaired, making its confidences vulnerable. Given those stakes, we are not persuaded that Eyak inappropriately prolonged litigation to increase attorney's fees.

Fourth, Borer appears to invoke financial hardship as an "equitable factor[]" under subsection (K).[69] Borer's only assertion about his financial hardship is that he "lack[ed] [the] funds" to hire counsel for his appeal. Borer has not shown that this hardship was so compelling that the superior court abused its discretion in granting Rule

---

[67] Eyak argues that this argument is waived because "Borer did not raise [this] argument at the superior court, nor present any supporting evidence that the Rule 82 award was 'so onerous' that it would discourage other plaintiffs from raising claims against Alaska Native Corporations." This waiver argument is plainly contradicted by the record, because Borer discusses this precise issue in his opposition to Eyak's motion for attorney's fees.

[68] Alaska R. Civ. P. 82(b)(3)(H).

[69] Alaska R. Civ. P. 82(b)(3)(K).

82's default award.[70] Borer could afford to and did hire counsel in the proceedings below. As the party filing the lawsuit, Borer should have been aware of the burdens of litigation and its attendant expenses. And Borer's extensive motion practice increased the amount of time spent on this case by both parties. We decline to find that the superior court abused its discretion based on Borer's financial hardship.

Fifth, Borer again appears to invoke equity[71] and argues that fees should be reduced because he "gains no personal benefit regardless of the outcome." But this is incorrect. Had he prevailed, Borer would have personally benefitted: he would have gained a seat on the board along with the attendant powers and compensation of a director, unburdened by the Agreements to which he objects.

Sixth, Borer argues that he should be "indemnified against legal fees" because had he won, he "would clearly be entitled to indemnification" under AS 10.06.490(c), which we have noted requires that "a corporation must indemnify a director who 'has been successful on the merits or otherwise' in defense of certain lawsuits."[72] But Borer was not "successful on the merits or otherwise" in his lawsuit; besides, he never raised this argument before the superior court, so it is waived.[73]

---

[70] *See Israel v. Dep't of Corr.*, 460 P.3d 777, 779, 786 (Alaska 2020) (declining to find trial court abused its discretion awarding attorney's fees to Department of Corrections when pro se litigant was incarcerated and had financial hardship).

[71] *See* Alaska R. Civ. P. 82(b)(3)(K) (allowing variation of attorney's fee award upon consideration of "equitable factors").

[72] *Holmes v. Wolf*, 243 P.3d 584, 590 (Alaska 2010) (emphasis omitted) (quoting AS 10.06.490(c), which mandates indemnity for directors).

[73] *McMullen v. Bell*, 128 P.3d 186, 190 (Alaska 2006) ("[T]his court will not consider an issue raised for the first time on appeal.'" (quoting *State v. Nw. Constr., Inc.*, 741 P.2d 235, 239 (Alaska 1987))).

Because Borer has not presented a compelling reason to reverse the superior court's grant of attorney's fees, we uphold the award.

## V.   CONCLUSION

We AFFIRM the superior court's judgment and award of attorney's fees for Eyak.